[No. B081681. Second Dist., Div. Three. June 27, 1996.]

KAMRAN MEHDIZADEH, Plaintiff, Cross-defendant and Respondent, v. TOM R. MINCER et al., Defendants, Cross-complainants and Appellants.

Counsel

Morton Frisch for Defendants, Cross-complainants and Appellants.

Behrouz Shafie for Plaintiff, Cross-defendants and Respondent.

Opinion

**KITCHING, Acting P. J.—**

### Introduction

Real property law distinguishes between the different concepts of adverse possession and prescriptive easement. It is more difficult to prove adverse possession, and with good reason; a claimant relying on adverse possession seeks fee title to disputed property. A prescriptive easement, by contrast, simply allows a claimant the restricted use of property owned by another.

This appeal involves a dispute between neighbors which followed their discovery that a fence built many years earlier was not located on the legal boundary between their properties. The claimant could not prove adverse possession because he did not pay taxes on the disputed property. The trial court nonetheless granted the claimant a prescriptive easement, but that easement was so broad that it denied the record title owners virtually all use of their property.

We hold that when a claimant cannot satisfy the requirements for adverse possession, the claimant may not receive a prescriptive easement which extends so far that it becomes the equivalent of a fee interest and dispossesses the record title owners of part of their property. We further hold that under the facts of this case, the claimant also failed to provide sufficient evidence to support a grant of title pursuant to the "agreed-boundary doctrine." We reverse the judgment with directions that the trial court quiet title to the disputed property in the legal owners.

### Facts

Plaintiff and respondent Kamran Mehdizadeh (Mehdizadeh) filed a complaint for declaratory and injunctive relief and for damages against defendants and appellants Tom R. Mincer and Janet Mincer (Mincers). Mehdizadeh's complaint sought a prescriptive easement over a portion of the

Mincers' property, an injunction ordering the Mincers to remove a fence and to restore the property to its former condition, and damages. The Mincers cross-complained for declaratory relief and to quiet title. A trial by the court disclosed the following facts.

In 1967, Mr. Cruz owned real property at 16957 Encino Hills Drive and installed a six-foot-high chain link fence (fence No. 1) between his property and the adjacent lot at 16951 Encino Hills Drive.

In November 1967, Donald Weissman and his wife (Weissmans) purchased 16951 Encino Hills Drive. Cruz informed the Weissmans of the cost of the chain link fence, and the Weissmans paid half that cost. Although the Weissmans assumed the fence was installed where their property ended, they did not know whether or not the fence was located on the property line.

On June 27, 1985, Cruz sold 16957 Encino Hills Drive to the Mincers. When they bought the property, the Mincers knew from plot maps that the chain link fence was not placed on the legal boundary. The record does not reflect the date, but at some point while the Weissmans still owned the adjacent property, the Mincers gave notice to the Weissmans, and then straightened out a small irregularity in the fence. The Weissmans did not recall discussing property lines in relation to making this small change. The Mincers did not have a survey done at that point.

On March 20, 1990, the Weissmans sold 16951 Encino Hills Drive to Mehdizadeh. They never told Mehdizadeh the fence represented the legal boundary. Mehdizadeh did not have a survey performed before he bought the property.

In 1990, the Mincers commissioned a survey, which established the legal boundary between the two properties. After receiving the survey, the Mincers determined that a fence dividing their property from that of Mehdizadeh should be located 10 feet down the slope from the original chain link fence. The Mincers delivered a survey map to Mehdizadeh on October 15, 1990. Mehdizadeh did not dispute the accuracy of the survey. In October 1990, the Mincers installed a new chain link fence (fence No. 2) at the boundary disclosed by the survey. Fence No. 1 has not been removed.

The "disputed property" is that area between fence number 1 and fence No. 2. It contains approximately 10 trees and numerous shrubs. Before fence No. 2 was built, Mehdizadeh occasionally cared for the vegetation in the disputed property, and the sprinkler system of the disputed property was

connected to Mehdizadeh's water supply. He maintained and repaired that sprinkler system. Mehdizadeh enjoyed the view of the disputed property, and his dog used the disputed property.

Construction of fence No. 2 destroyed vegetation and also destroyed sprinkler systems, for which Mehdizadeh sought damages.

The trial court's judgment found in favor of Mehdizadeh. The judgment ordered, pursuant to the agreed-boundary doctrine, that the boundary line be set at the location of fence No. 1. Mehdizadeh was to obtain title to the disputed land in fee simple, but was enjoined from using that land for any purposes other than landscaping and recreation; no structure of any kind was to be built or maintained on that property, except for fences and a retaining wall. The Mincers were to have an easement for light, air, and privacy; were ordered to remove fence No. 2; and were ordered to pay Mehdizadeh $1,500 damages to restore the property to its original condition as it existed before their obstruction. Mehdizadeh was to arrange for reassessment of the property and payment of corresponding property taxes. If a new fence was built, Mehdizadeh was to bear the cost. Any new fence was to be erected on Mehdizadeh's side of fence No. 1; it could not exceed 12 inches in width and could not interfere with the Mincers' existing views. The judgment also found that Mehdizadeh met the requirements for a prescriptive easement, and ordered that it be granted subject to the same restrictions and conditions regarding the agreed boundary.

## ISSUES

The Mincers claim on appeal that the trial court erroneously imposed an agreed boundary and erroneously granted Mehdizadeh a prescriptive easement.

## DISCUSSION

### 1. *The Agreed-boundary Doctrine*

The agreed-boundary doctrine is an exception to the general rule, which accords determinative legal effect to a description of land contained in a deed. As an exception, the doctrine may be invoked only under specific circumstances. The party claiming the land pursuant to the doctrine bears the burden of establishing that there is " '[1] an uncertainty as to the true boundary line, [2] an agreement between the coterminous owners fixing the line, and [3] acceptance and acquiescence in the line so fixed for a period

equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of its position.' " (*Bryant* v. *Blevins* (1994) 9 Cal.4th 47, 54-55 [36 Cal.Rptr.2d 86, 884 P.2d 1034], quoting *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 707 [336 P.2d 525].)

Where no evidence shows that prior owners of adjoining parcels agreed to resolve a boundary dispute and where legal records provide a reasonable basis for fixing the boundary, the agreed-boundary doctrine does not apply. *Bryant* held that the application of the doctrine was erroneous because the parties relying on the agreed-boundary doctrine failed to demonstrate that an uncertainty about the true boundary led prior coterminous owners to agree to fix the boundary at the location of a barbed wire fence.[1] (*Bryant* v. *Blevins, supra*, 9 Cal.4th at pp. 53-54.)

 The Mincers claim that in imposing an agreed boundary, the trial court erroneously relied entirely on implication from a long period of acquiescence by the parties' predecessors in title, with no evidence as to original owners' uncertainty and agreement as to the boundary line.

They rely on language in *Bryant* that refers to several Court of Appeal decisions. "The common theme of these decisions is a deference to the sanctity of true and accurate legal descriptions and a concomitant reluctance to allow such descriptions to be invalidated by implication, through reliance upon unreliable boundaries created by fences or foliage, or by other inexact means of demarcation." (*Bryant* v. *Blevins, supra*, 9 Cal.4th at p. 55.)

In *Bryant*, the record was silent as to when, or why, a barbed wire fence dividing two lots was built. The presence of the fence from 1977 until plaintiffs purchased their lot in 1986 suggested a lengthy acquiescence to its existence by plaintiffs' predecessor in interest. That circumstance alone, however, did not nullify the other requirements set forth in *Ernie* v. *Trinity Lutheran Church*; there had to be an uncertainty as to the location of the true boundary when the fence was erected, and neighboring property owners had to agree to use the fence to establish the boundary. In *Bryant*, no evidence satisfied either requirement. "[W]hen existing legal records provide a basis for fixing the boundary, there is no justification for inferring, without additional evidence, that the prior owners were uncertain as to the location of the true boundary or that they agreed to fix their common boundary at the

---

[1]*Bryant* also held that the agreed-boundary doctrine was not limited to instances in which existing legal records are inadequate to settle a boundary dispute. (*Bryant* v. *Blevins, supra*, 9 Cal.4th at p. 54.) This is not the problem in this appeal; the parties do not dispute that the deeds correctly described the parcels.

location of a fence. . . . [T]he agreed-boundary doctrine should not be invoked under the circumstances of the present case to trump the boundary established by the legal records." (*Bryant* v. *Blevins, supra,* 9 Cal.4th at p. 58.)

*Bryant* governs this appeal. Fence No. 1 existed when Weissman bought his property in 1967, and still stood when Mehdizadeh bought the property in 1990. Without more, however, this lengthy period of acquiescence does not satisfy the agreed-boundary doctrine. No evidence indicates that Weissman and his neighbor, Cruz (the Mincers' predecessor), had any uncertainty about the location of the boundary when the fence was built. No evidence indicates that Cruz and Weissman agreed to locate and build the fence to resolve that uncertainty. Weissman played no part in locating or building the fence; Cruz had installed it before Weissman moved in. Although he assumed the fence was placed where his property ended, Weissman had no idea whether the fence was installed on the property line or not on the property line. Under these circumstances the evidence is insufficient to support the agreed-boundary doctrine.

The purpose of the agreed-boundary doctrine is to secure repose and prevent litigation. (*Mesnick* v. *Caton* (1986) 183 Cal.App.3d 1248, 1256 [228 Cal.Rptr. 779].) The doctrine promotes the stability of agreements adjusting a disputed boundary as a method adopted in good faith by the parties to settle a controversy. It arose as a way to settle disputes over boundaries in an earlier time, when surveys were notoriously inaccurate and the monuments and landmarks they described could not be located. In more recent times, however, accurate surveys and verifiable recorded deeds are the rule. (*Armitage* v. *Decker* (1990) 218 Cal.App.3d 887, 903 [267 Cal.Rptr. 399].) Where the evidence does not satisfy the requirements of the doctrine, the law should not employ the agreed-boundary doctrine "to trump the boundary established by the legal records" (*Bryant* v. *Blevins, supra,* 9 Cal.4th at p. 58) and "to disposses[s] an owner of his land when a legal means of establishing an accurate boundary lies quite readily and conveniently to hand." (*Mesnick* v. *Caton, supra,* at p. 1257.)

Substantial evidence thus does not support the grant of title to the disputed property to Mehdizadeh based on the agreed-boundary doctrine. The judgment, however, also took second step, which was to grant Mehdizadeh an easement over the disputed property.

### 2. *Prescriptive Easement*

The Mincers argue that the judgment erroneously granted Mehdizadeh an interest that amounts to adverse possession under the guise of a

"prescriptive easement" that excludes the Mincers from entering or making any use of their land. We agree.

■ To establish the elements of a prescriptive easement, the claimant must prove use of the property, for the statutory period of five years, which use has been (1) open and notorious; (2) continuous and uninterrupted; (3) hostile to the true owner; and (4) under claim of right. (*Warsaw* v. *Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570 [199 Cal.Rptr. 773, 676 P.2d 584]; *Otay Water Dist.* v. *Beckwith* (1991) 1 Cal.App.4th 1041, 1045 [3 Cal.Rptr.2d 223].) ■ To establish adverse possession, the claimant must prove: (1) possession under claim of right or color of title; (2) actual, open, and notorious occupation of the premises constituting reasonable notice to the true owner; (3) possession which is adverse and hostile to the true owner; (4) continuous possession for at least five years; and (5) payment of all taxes assessed against the property during the five-year period. (*Buic* v. *Buic* (1992) 5 Cal.App.4th 1600, 1604 [7 Cal.Rptr.2d 738].)

Mehdizadeh could not claim adverse possession of the disputed property because he did not pay taxes on it. ■ A prescriptive easement does not require payment of taxes; someone claiming a prescriptive easement must show payment of taxes only in the rare instance the easement has been separately assessed. (*Gilardi* v. *Hallam* (1981) 30 Cal.3d 317, 321-322 [178 Cal.Rptr. 624, 636 P.2d 588].)

■ ■ Proof of the elements required for adverse possession (or for the agreed-boundary doctrine) gives a successful claimant *title* to property. ■ A successful claimant of a prescriptive easement, by contrast, gains not title but the right to make a specific *use* of someone else's property. (*Mesnick* v. *Caton, supra*, 183 Cal.App.3d at p. 1261.)

■ The judgment appears to have merged these concepts in granting Mehdizadeh a prescriptive easement, subject to several restrictions and conditions. We construe these restrictions and conditions to refer to that part of the judgment enjoining Mehdizadeh from using the disputed property for any purposes other than landscaping and recreation and from building, keeping, or maintaining any structures except for fences and a retaining wall; the judgment also states that the Mincers have the right to light, air, and privacy.

The prescriptive easement granted by the trial court, however, would divest the Mincers of nearly all rights that owners customarily have in residential property. A fence will bar the Mincers' access to the property, and they cannot build on, cultivate, or otherwise use it. Mehdizadeh cannot

build on it either, but otherwise his right to "use" looks more like "occupancy," possession, and ownership. (See, e.g., *Mesnick* v. *Caton, supra,* 183 Cal.App.3d at p. 1261; *Golden West Baseball Co.* v. *City of Anaheim* (1994) 25 Cal.App.4th 11, 35 [31 Cal.Rptr.2d 378]; *Raab* v. *Casper* (1975) 51 Cal.App.3d 866, 876 [124 Cal.Rptr. 590].)

Occupancy, connoting a claim of possession and title, differs from restricted, partial, or intermittent use. ▮ "An easement involves primarily the privilege of doing a certain act on, or to the detriment of, another's property." (*Wright* v. *Best* (1942) 19 Cal.2d 368, 381 [121 P.2d 702].) An easement gives a nonpossessory and restricted right to a specific use or activity upon another's property, which right must be *less* than the right of ownership. (*Mesnick* v. *Caton, supra,* 183 Cal.App.3d at p. 1261.)

A prescriptive use of land culminates in an easement (i.e., an incorporeal interest). This interest differs from a corporeal interest, such as that created by adverse possession or the agreed-boundary doctrine, which creates a change in title or ownership. Where an incorporeal interest in the use of land becomes so comprehensive as to supply the equivalent of ownership, and conveys an unlimited use of real property, it constitutes an estate, not an easement. (*Raab* v. *Casper, supra,* 51 Cal.App.3d at pp. 876-877.)

In *Raab,* for example, defendants installed utility lines, part of the driveway to their home, and part of their yard and landscaping on plaintiff's side of their common boundary. The trial court's judgment granted defendants an easement over plaintiff's property which, "[a]lthough adroitly phrased to avoid the language of a grant of title, . . . was undoubtedly designed to give defendants unlimited use of the yard around their home. . . . The findings and judgment were designed to exclude plaintiffs from defendants' domestic establishment, employing the nomenclature of easement but designed to create the practical equivalent of an estate." (51 Cal.App.3d at p. 877.) The granting of an estate in the real property required proof of adverse possession, which defendants could not show. Therefore *Raab* reversed.

There are some circumstances in which the grant of an exclusive easement, which resembles or is nearly the equivalent of a fee interest, can be justified. Under a proper showing, the courts may recognize, for example, the socially important duty of a utility to provide an essential service, such as water or electricity. (See, e.g., *Ajax Magnolia One Corp.* v. *So. Cal. Edison Co.* (1959) 167 Cal.App.2d 743 [334 P.2d 1053]; *City of Los Angeles* v. *Igna* (1962) 208 Cal.App.2d 338 [25 Cal.Rptr. 247]; *Otay Water Dist.* v. *Beckwith, supra,* 1 Cal.App.4th 1041.) In *Otay Water Dist.,* for example, a

grant deed conveyed three adjacent parcels of property not owned by the seller. The buyer, a water district, built and fenced a reservoir on the property in 1963. Part of the reservoir was built on the adjacent parcels. The water district enclosed the reservoir and the property with a second fence in 1974. In 1972, Beckwith bought 10 acres of undeveloped property next to the reservoir. The reservoir had been built on 1.68 acres of Beckwith's property that was mistakenly included in the water district's erroneous deed description. Beckwith first learned the reservoir encroached on his property in 1989, when the water district served him with its complaint to quiet title to a prescriptive easement. (*Id.* at pp. 1044-1045.)

Beckwith argued that the trial court erroneously granted the water district an exclusive easement, because a prescriptive easement by definition cannot be exclusive. Rejecting this theory, *Otay Water Dist.* stated: "The court's ruling is particularly justified on this record where Otay submitted uncontested evidence showing Beckwith's proposed recreational use would unreasonably interfere with Otay's right to continue operating a reservoir. Otay established its exclusive use is necessary to prevent potential contamination of the water supply and for other health and safety purposes." (1 Cal.App.4th at pp. 1047-1048.) We believe that *Otay Water Dist.* must be limited to its facts. The present appeal contains no public health or safety basis for granting an exclusive easement to Mehdizadeh.

As the very similar case of *Silacci* v. *Abramson* (1996) 45 Cal.App.4th 558 [53 Cal.Rptr.2d 37] has recently pointed out, the rationale underlying *Otay Water Dist.* has no application to a dispute between residential property owners which involves no socially important duty such as that imposed upon a utility. The trial court in *Silacci* granted to Abramson an exclusive prescriptive easement over a portion of Silacci's property marked by a three-foot-high picket fence and divided from the rest of Silacci's property by Toro Creek. *Silacci* distinguished the public health and safety basis for the exclusive prescriptive easement in *Otay Water Dist.*, and reversed: "An exclusive prescriptive easement is . . . a very unusual interest in land. The notion of an exclusive prescriptive easement, which as a practical matter completely prohibits the true owner from using his land, has no application to a simple backyard dispute. . . . An easement, after all, is merely the right to use the land of another for a specific purpose—most often, the right to cross the land of another. An easement acquired by prescription is one acquired by adverse use for a certain period. An easement, however, is not an ownership interest, and certainly does not amount to a fee simple estate." (*Silacci* v. *Abramson, supra,* 45 Cal.App.4th at p. 564.)

An easement defines and calibrates the rights of the parties affected by it. "The owner of the dominant tenement must use his or her easements

and rights in such a way as to impose as slight a burden as possible on the servient tenement." (*Scruby* v. *Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702 [43 Cal.Rptr.2d 810].) " '[T]he owner of the servient tenement may make any use of the land that does not interfere unreasonably with the easement.' " (*Camp Meeker Water System, Inc.* v. *Public Utilities Com.* (1990) 51 Cal.3d 845, 867 [274 Cal.Rptr. 678, 799 P.2d 758].) ██ The Mincers are fenced off from the property subject to the easement, and we question whether they can use, occupy, or enjoy it in any meaningful way. They have no access to the property. The fence reduces the size and alters the shape of their lot, potentially creating problems with setbacks and building codes that could impede alterations to structures the Mincers might wish to make, and also potentially reducing the value or salability of their property. The easement thus burdens the Mincers' property heavily, while leaving the Mincers only a minimal right to use it—enjoying air, light, and privacy rights.

Even if we were to disregard these practical and equitable considerations, the general rule remains which accords determinative legal effect to the description of land contained in a deed. (*Bryant* v. *Blevins, supra,* 9 Cal.4th at p. 54; *Marriage* v. *Keener* (1994) 26 Cal.App.4th 186, 192-193 [31 Cal.Rptr.2d 511].) To affirm the creation of this novel "fencing easement" would dispossess an unconsenting landowner of property while circumventing readily available, accurate legal descriptions. (*Bryant, supra,* at pp. 56-57; *Armitage* v. *Decker, supra,* 218 Cal.App.3d at p. 903; *Mesnick* v. *Caton, supra,* 183 Cal.App.3d at pp. 1256-1257.) ██ The rule regarding an "exclusive easement" is one of long-standing: "[A]n 'exclusive easement' is an unusual interest in land; it has been said to amount almost to a conveyance of the fee. [Citations.] No intention to convey such a complete interest can be imputed to the owner of the servient tenement in the absence of a clear indication of such an intention." (*Pasadena* v. *California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 578-579 [110 P.2d 983, 133 A.L.R. 1186].)

The facts show no such intention on the part of the Mincers. We conclude that the grant of the easement was error.

### DISPOSITION

The judgment is reversed. The cause is remanded with directions to the trial court to vacate its judgment and to grant no easement and to award no damages in favor of Mehdizadeh, and to enter a new judgment in favor of the Mincers on their cross-complaint quieting title to 16957 Encino Hills

Drive, according to the legal description of that parcel. Costs awarded to the Mincers.

Aldrich, J., and Klein, J.,* concurred.

A petition for a rehearing was denied July 24, 1996, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied October 23, 1996.

---

*Judge of the Municipal Court for the Los Angeles Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.