Filed 8/18/20  Sprankles v. Sullivan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| CHUCK SPRANKLES et al., <br><br> Plaintiffs, Cross-defendants and Appellants, <br><br> v. <br><br> SEAN SULLIVAN et al., <br><br> Defendants, Cross-complainants and Respondents. | D075334 <br><br><br> (Super. Ct. No. 37-2014-00029243-CU-OR-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

Blake Law Firm, Steven W. Blake and Andrew E. Hall for Plaintiffs, Cross-defendants and Appellants.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Timothy J. Watson, and Ernest Slome; Chuck & Tsoong, Stephen C. Chuck and Carley Mak Lee for Defendants, Cross-complainants and Respondents.

This appeal arises from a boundary dispute between two neighbors (the Sprankleses and the Sullivans) who live in a rural area of San Diego County. After a court trial with 20 witnesses and 79 exhibits, the court found the Sullivans were occupying a portion of the Sprankleses' property, but the Sullivans were entitled to remain in this portion of the property under theories of equitable easement and/or implied easement.[1] The court directed the Sullivans to pay the Sprankleses $40,053 as compensation for the exclusive easement. The court also restricted the Sullivans' use of the easement to certain activities; required the Sullivans to pay property taxes and insurance for the easement; and ordered that the easement would run with the land.

On appeal, the Sprankleses challenge the court's legal and factual conclusions. As to the equitable easement, we conclude the court applied the correct legal principles and its findings are supported by the evidence. Based on this conclusion, we do not reach the court's alternative implied easement finding.

FACTUAL AND PROCEDURAL SUMMARY

*Background*

The Sprankles and Sullivan properties were a single 1.71-acre parcel in the early 1960's, owned by the Andersons. A home (built in 1952) was on the lower part of the parcel. There were no other buildings on the property.

In about 1964, Mr. Anderson applied to split the parcel into a larger upper lot and a smaller lower lot, and submitted a proposed map prepared by his contractor. The existing home was on the lower lot. The county granted

_____

[1] The two properties are depicted on Appendix A, *post*, page 32. The Sprankles property and home are at the top of the map, and the Sullivan property and home are at the bottom. The triangle bordered by the blue and purple lines reflects the disputed area.

2

the application and approved a final division plat map in January 1965 (1965 Map; attached as Appendix B, *post*, page 33). As depicted on Appendix B, this map showed the boundary line about 37 feet from, and parallel to, the corner of the existing home on the lower lot. (See Appendix B, green circle.)

In 1966, the Andersons built a home on the upper lot and moved into that home, and lived there for the remainder of their lives. They never recorded the 1965 Map, and the county assessor continued to tax the Andersons for the property as a single 1.71-acre parcel. During the next several decades, the home on the lower lot was occupied by various Anderson family members, including their grandson.

In 2004, after both Andersons had died, the Anderson estate initially listed the entire Anderson parcel for sale as a single, 1.7-acre property with two homes (the home built by the Andersons in 1966, and the home on the lower lot built in 1952.). In April 2004, the estate changed the listing to state it was in the " 'process of effecting recordation of division of land to [the upper] parcel at 1.1 acres, and "lower" parcel . . . [a]t .6 acres.' " The estate then hired surveyor William Teas to prepare the metes and bounds descriptions to be used in the grant deed for each parcel. Teas prepared the metes and bounds using the 1965 Map (he was not retained to physically survey the property).

It is undisputed Teas made mathematical errors in preparing the metes and bounds description. As discussed below, instead of making the boundary line 37 feet from the home on the lower parcel, the line reflected in Teas's description came quite close to the lower house, within nine or 10 feet of the front door and cutting through a small portion of the roof.

The deeds using Teas's metes and bounds descriptions were recorded in 2004. Thereafter (and to the present day) the county assessor taxed the

3

upper property as a 1.11-acre parcel and the lower property as a .6-acre parcel. After the division, in 2004, the Anderson estate sold both parcels to a financial entity (U.S. Financial), which then sold the upper lot (1.1-acre parcel) to Roseanne Kemp in about November 2004.

The next year, in 2005, U.S. Financial sold the lower lot (.6-acre parcel) to Tracey Sullivan (who later added her husband Sean to the title). Before purchasing the property, the Sullivans were given a copy of the 1965 Map, which was marked "FINAL" and showed the property line 37 feet from the southwest corner of the house. (See Appendix B, green circle.) The grant deed also referenced the 1965 Map.

At the time, an 8-foot by 8-foot shed and a large propane tank were located in the area within 37 feet of the lower parcel residence. The lower parcel (which sloped down from the upper property) was also cut in such a way "to create a [level] pad" for the house on the lower lot. The building pad for the lower property was marked by a five foot tall cut in the hillside along the then-existing tree line.

Before the purchase, the Sullivans had asked the seller to mark the corners of the property, but the seller refused. However, when the Sullivans walked through the property before the purchase, they observed that the house, the cut and trees, and the placement of the shed and propane tank were fully consistent with the 1965 Map boundaries. Although their realtor recommended a survey, they decided not to retain a surveyor because of the expense and because the 1965 Map appeared to accurately reflect the boundaries of the property.

At the time of their purchase, there was no fence or other physical dividing line separating the two parcels. Soon after their purchase, Mr. Sullivan erected a fence separating the properties. He intended to build the

4

fence where he believed their property line was located as depicted on the 1965 Map, which was 37 feet away from and parallel to their house. To do so, he measured about 37 feet "off the house" and also used the tree line (which was not on the 1965 Map) to determine the proper location of the fence boundary line. He used his footsteps, a measuring tape, the 1965 Map, and the tree line.

As he was doing this, neighbor Kemp approached him and indicated she disagreed with the proposed location because she thought he was installing the fence on her property. She told him she had a survey of her property, but he did not ask to see it and she did not offer to show it to him. She testified she then brought out a lengthy string to help Mr. Sullivan measure and "figure out" where the fence should be placed.

Within days or weeks, Kemp observed "some workers come out and start to put the fence up." When Kemp saw they were putting the fence "a little bit too far up" on her property, she or her son "asked them to move it down a little bit [toward the Sullivan property]." Kemp testified that after the workers complied by moving the fence "a few feet," she was satisfied and had no issue with the fence location. She believed the fence was at or near the property line, but never confirmed this with the survey. She thereafter assumed the fence (which was about 37 feet from the Sullivan home) was the correct dividing line between the properties. The fence appears as the red line on Appendix A.

Soon after the fence was placed, the Sullivans built a room addition on the northern/upper side of the home (but did not obtain a permit for the improvement). (See Appendix A; black circle.) They did so believing that the property line was 37 feet from their house.

In 2010, Kemp sold the upper lot property (resulting from a foreclosure). A third party bought the property, and three years later in August 2013, Chuck and Lynn Sprankles purchased the upper lot property from the third party and/or the third party's successor. Before they purchased the property, the Sprankleses did not conduct a survey. However, shortly after escrow closed, they hired a professional surveyor (Chris Ciremele) to survey the property based on the legal descriptions contained in the Sprankleses' grant deed (containing the Teas metes and bounds description.)

The Ciremele survey disclosed that the property line set forth in the grant deed's metes and bounds description was much closer to the Sullivan's home, and not the 37-foot distance shown in the 1965 Map. As reflected in Appendix A, the Ciremele property line (shown in blue) cuts across a small portion of the Sullivans' room addition and is located within 10 feet of the Sullivans' residence, slicing at an angle that would "nick[ ] the original corner . . . of the original roof" (before the room addition was constructed).

Upon receiving the results of the Ciremele survey, the Sprankleses immediately asserted that the Sullivans were trespassing, demanded the fence be removed/moved, and alternatively that the Sullivans pay the Sprankleses $25,000 to purchase the disputed area. The area within the disputed area (approximately 5,404 square feet) was mostly dirt, trees, and plants, and was used by the Sullivans for their horses, parking their vehicles, and various recreational activities, including for their small child.

*Cross-Lawsuits*

When no agreement was reached, the Sprankleses filed a lawsuit against the Sullivans, requesting the court order the Sullivans to remove the fence, cease and desist from continuing their trespass, and pay damages. The

6

Sprankleses alleged four causes of action: (1) quiet title; (2) trespass; (3) nuisance; and (4) declaratory relief.

The Sullivans filed a cross-complaint. Their amended cross-complaint alleged (1) trespass; (2) nuisance; (3) negligence; (4) quiet title; and (5) declaratory relief and related equitable claims. In their pleading and at trial, the Sullivans asserted several alternative theories for their quiet title claim, including adverse possession; agreed boundaries; easement by prescription; equitable easement; and implied easement.

*Trial*

At the outset of the bench trial, the court conducted a site visit to the property. During trial, the parties each testified and presented various engineering and surveyor experts on the issue of the proper boundary between the properties. The Sprankleses argued the correct boundary line was the Ciremele line (shown in blue on Appendix A). The Sullivans argued the correct boundary line was the line shown in purple on Appendix A, based on a survey performed by their expert, Dan Hooper, which gave them more property than enclosed by their fence. As will be described below, the parties also testified and presented experts and other witnesses (including from governmental entities) on the costs and benefits associated with each of the proposed property lines.

After a five-day trial, counsel gave their closing arguments. Immediately after, the court discussed some "tentative thoughts" and then took the matter under submission. In its tentative thoughts, the court noted it did not find either party was at fault, but said it was "faced with the situation where the Anderson estate gummed this thing up pretty bad." The court said, "I don't think Mr. Anderson ever intended for there to be a fence" so close to the lower lot house, and that based on the court's site visit, "it

7

seemed pretty clear to me . . . that in subdividing his property [Mr. Anderson] wanted to have a fair amount of room between the [lower lot residence] and the property line." But the court said it was "strongly inclined to go with the" Ciremele boundary line because it reflected the legal description in the recorded grant deeds.

The court also observed that the use of the disputed area is "very, very important for the Sullivans." With respect to the Sullivans' intentions, the court said: "I found Mrs. Sullivan['s] testimony to be very convincing and very credible that [before purchasing the property] she took that [1965 Map] and walked along and Mr. Sullivan did the best he could [in placing the fence]. I think he took a few liberties with the fence. But it's been used like that for years. They have horses and . . . [it] should have been clear to the Sprankles[es] when they bought the property that the horses were there and the horses need some room to roam."

*Statement of Decision*

The court then issued a detailed 29-page statement of decision addressing each of the parties' causes of action. In sum, the court found the Sprankleses proved they legally owned the disputed area, but the Sullivans had the right to continue to exclusively occupy that area under theories of equitable easement and/or implied easement.

On the Sprankleses' quiet title claim, the court found they established the true boundary was the line determined by the Ciremele's survey (based on Teas's metes and bounds description in the grant deeds). The trial court explained that although the 1965 Map was approved under a San Diego County ordinance, "the two new parcels were not [legally] created until recordation of the 2004 deeds incorporating Mr. Teas's metes and bounds descriptions." (See *Gardner v. County of Sonoma* (2003) 29 Cal.4th 990,

8

1001-1002.) Based on this determination, the court found the Sprankleses established their trespass and nuisance claims, but then concluded they did not prove they suffered any damages from this conduct.

With respect to the Sullivans' affirmative claims, the court first found the Sullivans did not prove several of their proffered theories for establishing their right to remain occupying the disputed area.

On their adverse possession claim, the court found the Sullivans did not pay taxes on the disputed area, or show their occupancy was "sufficiently hostile" because their fence was "first installed with [Kemp's] consent . . . as a neighborly accommodation."

On their prescriptive easement claim, the court found the Sullivans did not show their use of the Sprankles property was "truly 'adverse' for the requisite period of time [five years]." The court also stated that "California law rejects the notion that a neighbor can obtain what is essentially a fee interest or an 'exclusive prescriptive easement' in residential boundary disputes by constructing encroachments on, or fencing off portions of, the adjoining landowner's property," citing *Raab v. Casper* (1975) 51 Cal.App.3d 866 (*Raab*); *Silacci v. Abramson* (1996) 45 Cal.App.4th 558 (*Silacci*); and *Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296 (*Mehdizadeh*).

On the agreed-boundary claim, the court found there was no evidence Kemp and the Sullivans "entered into an agreement to resolve a boundary dispute," noting the subject of their discussions was mainly about the fence installation and not about boundary lines.

But the court found the Sullivans met their burden to establish an implied easement and an equitable easement "over the disputed area bounded by the Sullivan fence." With respect to the equitable easement, the court identified the three required elements for creating this easement:

9

(1) the trespasser's " 'innocen[ce]' "; (2) no " 'irreparable injury' " to the legal title holder; and (3) the hardship to the party seeking the easement is " 'greatly disproportionate to the hardship caused [to the legal title holder],' " citing *Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1009 (*Tashakori*). The court then found the Sullivans met their burden on each of these elements (as will be discussed below). But the court found the Sprankleses were entitled to compensation from the Sullivans for the value of the disputed area (later stipulated to be $40,053).

The court "[a]lternatively" found the Sullivans established an implied easement over the disputed area, based on its findings there was a prior unity of title; the use in question "was continuous, obvious and apparent" at the time of the property division; and the easement was reasonably necessary to the beneficial enjoyment of the property.

As to the Sullivans' trespass, nuisance, and negligence causes of action, the court found the Sullivans could not recover on these claims based on its determination the Sprankleses held legal title to the disputed property.

*Final Judgment*

After further hearings and input from the parties, the court entered a final judgment. In relevant part, the judgment provided the following.

On the Sprankleses' complaint, the court found in favor of the Sprankleses on their quiet title and declaratory relief claims, stating "the legal boundary of the Sprankles Property is as described by the metes and bounds description contained in the Grant Deed to Sprankles. . . ."

On the Sullivans' cross-complaint, the court found the Sullivans established portions of their quiet title and declaratory relief claims. The court found the Sullivans proved their entitlement to "an exclusive equitable easement . . . over and appurtenant to the Sprankles Property, consisting of

10

[5,404 square feet] legally described and depicted in [an attached exhibit]." The judgment identified the sole permitted uses of the easement, which included mainly recreational, horse-grazing, and gardening-type activities, and precluded any building or fixtures in the easement area, except for one eight-foot by eight-foot shed.[2]

The court also ordered the Sullivans and/or their successors to: "(i) maintain general liability insurance coverage in the amount of $1 million . . . on the equitable easement area naming Sprankles or their successors as additional insureds; (ii) indemnify Sprankles or their successors for any third-party liability which Sprankles or their successors may incur arising

---

[2]    This portion of the judgment states: "Such equitable easement shall be used for the following historical uses and no other purposes: driveway and vehicle access, the maintenance of trees and other vegetation, yard, gardening, landscaping, existing landscaping water lines, walking, playing, recreation, vehicle parking, recreational vehicles parking, parking horse trailers, ingress and egress, bike riding, motorcycle riding, all-terrain vehicle riding, horse and donkey grazing, pet area, maintenance of a perimeter fence along the boundary of the easement, maintenance of the residential and other structures shown on [an attached] Exhibit D and associated utilities, for access to propane and septic tanks, and compliance with applicable County set back requirements for the existing Sullivan residence. The Sullivans or their successors' use of the equitable easement must comply with all federal, state and local laws and regulations. Although the encroaching portion of the Sullivan residence may be improved, the footprint of the encroachment shall not be enlarged from what appears on Exhibit D. The existing 12 x 24-foot storage shed which encroaches on the equitable easement shall be moved off the easement within (90) days following entry of the Judgment. The Sullivans shall have the right to install one 8 x 8-foot shed within the equitable easement. Other than those structures listed above as an allowable use, and those structures appearing on Exhibit D, no permanent structure constructed in a manner to constitute a fixture as defined under California Civil Code section 660 shall be erected or placed within the equitable easement. Sprankles and their successors shall not interfere with the Sullivans' equitable easement rights and are prohibited from entering the easement area without the consent of [the] Sullivans or their successors."

11

from [the] . . . use of the equitable easement; (iii) pay the sum of [$40,053] to Sprankles as compensation for the equitable easement within sixty . . . days after entry of this judgment; (iv) pay all expenses associated with maintenance of the equitable easement; and (v) timely pay the pro-rata portion of property taxes for the 5,404 square feet of the equitable easement." The judgment set forth detailed procedures for ensuring the Sullivans (and/or their successors) comply with the insurance and tax payments requirements.

The court determined the "equitable easement . . . shall . . . run with the land and be binding upon all successors and assigns of the Sprankles and Sullivan[ ] Properties," but that the Sullivans' exclusive possession and control over the easement "shall not ripen into adverse possession of, or any ownership interest in, the equitable easement."

The court also found "an implied easement in favor of [the] Sullivans over . . . the Sprankles Property consistent with and identical in location and purpose to the equitable easement . . . ." The court concluded that both parties were prevailing parties under Code of Civil Procedure section 1032, subdivision (a)(4).

The Sprankleses appeal, challenging the court's findings that the Sullivans proved their easement claims.

## DISCUSSION

### I. *Review Standards Applicable to Equitable Easement*

We review a court's decision whether to recognize an equitable easement under the abuse of discretion standard. (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1005-1006 (*Nellie Gail*).) This standard "includes a substantial evidence component: 'We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion. If

12

there is no evidence to support the court's findings, then an abuse of discretion has occurred.' " (*Id.* at p. 1006.)

In evaluating challenges to the court's factual findings, we consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102.) If the evidence supports the finding, " 'no matter how slight it may appear in comparison with the contradictory evidence, the [finding] must be upheld.' " (*Keys v. Alta Bates Summit Medical Center* (2015) 235 Cal.App.4th 484, 488.) These rules apply to challenges to the factual findings contained in a statement of decision. (See *Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935; *Estate of Young* (2008) 160 Cal.App.4th 62, 75-76.) Under these principles, an appellate court " ' "must *presume* that the record contains evidence to support every finding of fact . . . ." ' [Citations.] It is the appellant's burden . . . to identify and establish deficiencies in the evidence. [Citation.] This burden is a 'daunting' one." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)

On legal questions, we apply a de novo review and exercise our independent judgment. (*San Bruno Committee for Economic Justice v. City of San Bruno* (2017) 15 Cal.App.5th 524, 529.)

II. *Legal Principles Governing Equitable Easement*

"California courts have . . . the discretionary authority to deny a landowner's request to eject a trespasser and instead force the landowner to accept damages as compensation for the judicial creation of an [equitable] easement over the trespassed-upon property in the trespasser's favor, provided that the trespasser shows that (1) her trespass was ' "innocent" ' rather than ' "willful or negligent," ' (2) the public or the property owner will

13

not be ' " 'irreparabl[y] injur[ed]' " ' by the easement, and (3) the hardship to the trespasser from having to cease the trespass is ' " 'greatly disproportionate to the hardship caused [the owner] by the continuance of the encroachment.' " ' " (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 19 (*Shoen*)*; accord Tashakori, supra,* 196 Cal.App.4th at pp. 1008-1009.)

Unless all three elements are established, a court lacks the discretion to grant an equitable easement. (*Shoen, supra,* 237 Cal.App.4th at p. 19; see *Ranch at the Falls LLC v. O'Neal* (2019) 38 Cal.App.5th 155, 184-185 (*Ranch*).) This is true even if the court believes the imposition of an equitable easement is fair and equitable under all circumstances. (*Shoen,* at pp. 19-21.) Thus, the court's focus must be on the three elements, rather than "a more open-ended and free-floating inquiry into which party will make better use of the encroached-upon land, which values it more, and which will derive a greater benefit from its use." (*Id.* at p. 21.) " 'Overarching the analysis' " is the importance of the legal owner's property rights and " 'the principle that since the [encroacher] is the trespasser, he or she is the wrongdoer; therefore, "doubtful cases should be decided in favor of the [property owner with legal title]." ' " (*Nellie Gail*, *supra,* 4 Cal.App.5th at p. 1004*; accord Shoen*, at pp. 20-21.)

The Sprankleses challenge the court's findings with respect to each element. We address these contentions below.

### III. *First Element: Trespass Must be Innocent*

The first element requires the party seeking an equitable easement to prove the trespass was " 'innocent' " rather than " 'willful or negligent.' " (*Nellie Gail, supra,* 4 Cal.App.5th at p. 1003.) This factor " 'is the most important' " element to establishing an equitable easement. (*Ranch, supra,*

14

38 Cal.App.5th at p. 184; *Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1028-1029 (*Hansen*).)

The court found the Sullivans established this element based on its conclusion that the Sullivans purchased the property and installed the fence "in good faith reliance on the 1965 Map," which the court found "clearly indicates that the boundary line between the two residences was located 37 feet away from and parallel to the Sullivan [house]." The court explained that although the Sullivans did not obtain a survey, the 1965 Map appeared correct because it was consistent with the items in that area, including the propane tank and shed, and with the cut in the land.

There was ample evidence to support the court's finding. The 1965 Map was an official document approved and stamped by the county, and marked "FINAL." This map displayed the property layout consistent with the physical attributes of the property. The shed and propane tank serviced the residence on the lower lot. Additionally, the property was cut in such a way "to create a pad" for the house on the lower lot, and this pad was located within the 37 foot boundary area.

Based on these facts, the court had a reasonable basis to find the Sullivans' failure to learn the true boundaries was innocent. A finding that an encroacher was " 'innocent' " does not require a finding of " 'no fault whatsoever,' " and instead necessitates a common sense analysis of whether the individual knew or had a reason to know or learn about the true facts. (*Hansen, supra,* 22 Cal.App.5th at p. 1030; see *Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 266-267.) Because this analysis is dependent on the particular circumstances, "[t]he question whether the [encroacher's] conduct is so egregious as to be willful or whether the quantum of the

defendant's negligence is so great as to justify an injunction is a matter best left to the sound discretion of the trial court." (*Linthicum,* at p. 267.)

In contending the court abused its discretion, the Sprankleses suggest the Sullivans were negligent as a matter of law because they did not obtain a survey, relying on *Hansen, supra,* 22 Cal.App.5th 1020 and *Nellie Gail, supra,* 4 Cal.App.5th 982. Neither of these decisions support such a broad proposition.

In *Hansen,* the landowner's managing partner was aware that an area of land in which the landowner planted pistachio trees was subject to a "lot line" dispute with the neighboring property owner. (*Hansen, supra,* 22 Cal.App.5th at pp. 1025-1026.) This partner "knew . . . 'that a lot line adjustment needed to happen,' " but nonetheless planted trees on the neighbor's property. (*Id.* at pp. 1026, 1029.) The court found this knowledge reflected negligence with respect to the encroachment, reasoning: "*While growers do not have a general duty to survey or otherwise confirm boundaries before planting,* it is negligent to plant permanent crops on a swath of land, *knowing* that some unspecified part of that land is in need of a 'lot line adjustment.' " (*Id.* at p. 1030, italics added.) In so concluding, the court agreed with the landowner that it is not necessarily negligent to determine boundaries based on "visual cues" on the property or on a neighbor's lack of an objection, but the court found that during the relevant time, the landowner "*did* have reason to doubt [its] prior assumptions . . . . [The landowner] planted the pistachio trees in the area *after* becoming aware that there was a lot line issue concerning the border between their parcel and [the neighbor's property]." (*Ibid.*)

This case is different because the facts do not support that the Sullivans were on notice of a boundary issue or dispute. Moreover, unlike in

16

*Hansen*, the Sullivans relied on a plat map stamped "FINAL" that had been approved by the governing public entity and was fully consistent with the property's physical layout and the existing items on the property.

This case is also unlike *Nellie Gail*, in which the trial court made factual findings that the property owners who built a wall encroaching common area property "*knew* where their . . . property line was located" and they "*intentionally did not identify*" the property line on plans submitted to their homeowners association, and then began constructing their wall on common area property despite knowing they did not have the required homeowner association approvals. (*Nellie Gail, supra,* 4 Cal.App.5th at p. 1005, italics added.) This case differs because the court found no evidence the Sullivans knew or should have known of the actual property line.

The Sprankleses also rely on the interactions between Mr. Sullivan and Kemp (the former owner of the Sprankles property) to establish negligence as a matter of law. This reliance is misplaced. First, Kemp assisted Mr. Sullivan in determining where the fence would go using a long string, and never suggested that the boundary line was not in that general area. Second, Kemp's asking the workers to move the fence "a few feet" away from her property does not reasonably suggest that this action would have communicated to the Sullivans that the 1965 Map was inaccurate. To the contrary, the facts showing Kemp had a survey and requested the fence to be moved to the area where it was ultimately erected, and that she accepted the fence as the dividing line, support that it was reasonable for the Sullivans to believe that the fence was on the boundary line. Moreover, even if Kemp believed the fence slightly straddled her property, there is nothing in the record showing she expressed that opinion to the Sullivans.

Further, we find unhelpful the Sprankleses' reliance on the court's remark that Mr. Sullivan "took a few liberties with the fence." A trial court's tentative oral comments after closing argument are not binding. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268.) Moreover, read in context, the statement does not suggest the court found Mr. Sullivan knew or should have known that the 37-foot distance was not the true boundary line. More likely, the court was referring to where Mr. Sullivan initially sought to place the fence, not to Mr. Sullivan's belief that the 37-foot distance was inaccurate.

The Sprankleses alternatively contend the court erred by not making express findings "as to how" the Sullivans were innocent. We disagree. In its statement of decision, the court identified the requisite " 'innocent' " element, and referred to the fact that the Sullivans acted in good faith reliance on the 1965 Map and noted that the Sullivans were "faultless." A statement of decision must include an explanation of "the factual and legal basis for [the court's] decision as to each of the principal controverted issues at trial" (Code Civ. Proc., § 632), and the statement "is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case" (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380). The court's statement here met this standard. (*Ibid.*; see *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 763 (*Hirshfield*).)

Moreover, the Sprankleses forfeited this challenge because they did not object to the statement of decision on this basis. If a statement of decision fails to decide a controverted issue or is ambiguous, a party must bring the omission or ambiguity to the trial court's attention either before the entry of judgment or in a posttrial motion. (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983; *In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411,

18

1424; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.)  Absent this challenge, the reviewing court will infer the trial court made all factual findings necessary to support the judgment and a party is precluded from raising the defect on appeal.

We also find unavailing the Sprankleses' contention the trial court's "innocent" finding is inconsistent with the court's conclusion that the Sullivans trespassed on their property.  The essence of an equitable easement is that it authorizes "a trespasser to continue her trespass in exchange for paying damages." (*Shoen, supra,* 237 Cal.App.4th at pp. 17-18.)  Under this settled law, a finding of a trespass is often a prerequisite for, and does not negate, the existence of an equitable easement.  (See *Hirshfield, supra,* 91 Cal.App.4th at pp. 758-759 [court considers equitable easement doctrine *after* "the court determines that a trespass has occurred"].)

We reject the Sprankleses' similar argument that the Sullivans' allegation that their use of the Sprankles property was " 'actual, open, notorious, exclusive, hostile and adverse' " was a "judicial admission" precluding a finding that their use of the property was innocent.  Although allegations of adverse possession and equitable easement are often inconsistent, a court is not precluded from finding that one (and not the other) theory has been proved.  Inconsistencies between a plaintiff's legal theories are permitted.  (See *Adams v. Paul* (1995) 11 Cal.4th 583, 593 ["a party may plead in the alternative and may make inconsistent allegations"].)

IV.  *Second Element:  Irreparable Harm*

On the second equitable easement element, the moving party must prove the property owner (here, the Sprankleses) would not suffer irreparable harm.  (*Shoen, supra,* 237 Cal.App.4th at p. 19.)

19

The court found this element was established based on facts showing the Sprankleses bought the property knowing of the fence and the use of the property consistent with the fence; the fact they were willing to allow the Sullivans to purchase the disputed property for $25,000; the location of the Sprankleses' home far from the disputed area; the lack of any actual or intended use of this portion of the property by the Sprankleses; and none of the Sprankleses' structures, hardscape or landscaping would be impacted. As discussed in connection with the third element, these findings were supported by the evidence.

The Sprankleses argue the court improperly shifted the burden of proof on this element by stating the "Sprankles[es] have failed to present any credible evidence that they would suffer harm or prejudice." The Sprankleses forfeited this argument by failing to bring this issue to the trial court's attention. In any event, based on our review of the entire statement of decision, we are satisfied the court understood that the Sullivans had the burden to prove each element of an equitable easement, and this single sentence did not reflect the court's shifting of this burden.

In arguing the court erred on the irreparable-injury element, the Sprankleses rely on the Sullivans' real estate appraiser's testimony that if the Sprankleses are unable to access the disputed portion of their property, their property value will be reduced by about $35,000. This testimony does not establish *irreparable* harm because the court awarded the Sprankleses $40,053, reflecting compensation for this loss. An easement will frequently result in the servient property losing certain value. Although this fact is relevant in the balancing test (the third element), it does not necessarily establish *irreparable* harm (the second element).

The Sprankleses' reliance on *Shoen* for a contrary conclusion is misplaced. (*Shoen, supra,* 237 Cal.App.4th 16.) In *Shoen,* two hillside neighbors shared a flat "patch" of land that was readily accessible only by the defendant's property, but owned by the plaintiff. (*Id.* at p. 18.) The defendant put some furniture on the "patch," believing she owned this property. (*Ibid.*) The plaintiff later sued to reclaim this land as her property. (*Ibid.*) The trial court held the defendant was entitled to an equitable easement allowing her to maintain her furniture and use this portion of the property. (*Id.* at pp. 18-19.) The appellate court reversed, finding the defendant failed to satisfy her burden on the third element (balancing of hardships) of the equitable easement test. (*Id.* at pp. 17-18, 21.) The court reasoned that the removal of the furniture (costing $300) "was not greatly disproportionate to the hardship on" the plaintiff, which included the loss of use to this property. (*Id.* at p. 21.)

As reflected in this description, the *Shoen* court did not address the irreparable harm element and did not state or suggest that a court is required to find the property owner suffers irreparable harm merely from the loss of use of the property. Moreover, *Shoen* is distinguishable on the third (balancing) element because (as discussed below) unlike the $300 cost of removing the furniture, the court found a denial of an equitable easement would result in the Sullivans bearing substantial cost, including the loss of functionality of their home; the removal and replacement of their fence; and the repair and remodel of their home.

V. *Third Element: Balancing of Harms*

On the third equitable easement element, the moving party must show the hardships or conveniences "tip disproportionately in favor of the trespasser." (*Shoen, supra,* 237 Cal.App.4th at p. 19.) On this element, the

21

court must start with the presumption that the property owners will be harmed because of their "substantial interest in [the] exclusive use of [the] property arising solely from [their] ownership of [the] land." (*Id.* at p. 19.) Thus, the party seeking to establish the easement must "prove that she will suffer a *greatly disproportionate* hardship from denial of the easement than the presumptively heavy hardship the owner will suffer from its grant." (*Id.* at p. 20.)

The court made a specific finding that the Sullivans met their burden to prove their hardship from the denial of the easement "*greatly outweighs* any prejudice to the Sprankles[es]." (Italics added.) The Sprankleses challenge the sufficiency of the evidence to support this conclusion. This challenge is without merit. The court made express findings regarding the substantial detriment likely to result from the Sullivans' expulsion from the disputed area and the fact the Sprankleses' losses would be relatively minimal. The factual record supports these findings.

As to the burden on the Sullivans, they testified that the disputed area was important to their use of their home and its functionality. The evidence showed that the Ciremele boundary line comes within nine or 10 feet of their front door; intersects their room addition; and slightly clips their original roof. Based on this evidence, along with the Sullivans' testimony and photographs reflecting their use of the property and the court's observations during its site visit, the court concluded: "It is clear to the Court the use of the area is 'essential to the Sullivans given the configuration of their house, and the five-foot cut line that runs in a contiguous pattern along the property.' Quite simply, it is essential for the Sullivans to be able to use the [disputed] area . . . given the proximity of the area to their house." (Footnote omitted.)

22

The Sullivans also presented evidence of the monetary burden resulting from the enforcement of the Ciremele property line.

The evidence showed that currently (and in 2006 when the room addition was built) there is a 15-foot setback for construction on this residential property. A county planning manager (Dag Bunneymeyer) testified that although the residence built in the 1950's would be "grandfathered," the room addition built in 2006 and any future remodeling would constitute nonconforming uses and could be subject to, and required to comply with, the 15-foot setback. He said that variances are possible, but a variance grant would require public hearings at which neighbors would have the right to object and be heard.

The Sullivans retained a construction expert, Timothy Valine, to testify about the possible construction costs resulting from the imposition of the Ciremele boundary line, including the enforcement of the 15-foot setback. Valine estimated that the cost of demolishing the home and then rebuilding a brand new home within the setback requirements would be $230,000. He *alternatively* evaluated the costs of remodeling/repairing the home (rather than tearing down the entire home) so that the home and related items would be within the proper boundaries and comply with the applicable 15-foot setback. Valine estimated this latter cost to be $231,172.98.

Valine prepared a lengthy 43-page report to explain and support this repair/remodel estimate. This report was admitted as an exhibit at trial. The report listed several cost categories resulting from the need to alter the residence if the Ciremele boundary line was enforced: (1) demolition of the room addition affected by the line ($28,956.06); (2) costs to enclose the cut line ($17,488.59); (3) costs to extend the existing footprint to maintain the same square footage ($151,541.61); (4) moving affected items (such as

23

propane tank and irrigation lines) ($31,011.12); and (5) relocating and storing owner contents ($2,175.60).

Valine acknowledged that the estimates were "hypothetical" because it is not possible to predict precisely what the building department would require a homeowner to do until the homeowner has submitted plans or an application for a permit. And he admitted he has never seen a case where a governmental entity has required a homeowner to move a home. But he testified that in his professional opinion certain of these remodel/repair costs would be incurred by the Sullivans.

After considering the testimony and exhibits, the court found Valine's opinions credible, stating:

> "The Sullivans' general contractor expert, Tim Valine, testified that if the boundary is moved inward, the Sullivan residence will likely be out of the County Code's 15-foot side yard setback compliance. Although Dag Bunneymeyer, an employee at the County's Planning department testified that there were no zoning restrictions or setbacks in 1965, he admitted that if the Sullivans expand on the existing property, it would trigger the current set back requirement of 15 feet . . . .

> [¶] . . . [¶]

> "The court finds Mr. Valine's testimony credible and that there is a real potential that the Sullivans' current expansion and/or future remodeling would trigger the County's current setback requirements. Mr. Valine further testified that if the current County setback of 15 feet is triggered by the expansion of the Sullivan residence or by imposition of the Ciremele Survey line, it is reasonably probable that the Sullivans will incur the following costs: (1) moving of utilities out of the disputed area; (2) removal of the northwest corner of the Sullivan house; (3) potential relocation of all or a portion of the Sullivan residence; and (4) that the County may require other portions of the Sullivan residence be brought up to current code standards.

24

In other words, . . . . [if] the Sullivans were forced to move their existing residence to a different location to comport with the setback requirements, or if the Sullivans' residence is required to be modified or altered to some extent, the estimated costs would be roughly $230,000."

In contrast to these significant costs, the court found the Sprankleses would suffer minimal detriment, particularly because they would receive full compensation for the monetary value of the easement property ($40,053). The court noted that the Sprankleses purchased the property with full knowledge of the boundary fence and that the area was being used for the neighbor's horses; the Sprankleses had offered to sell the property to the Sullivans for $25,000 before the litigation began; the disputed area was far from the Sprankleses' residence and not a useable space for the residence; and the disputed area had never been used by the Sprankleses or their predecessors.

At trial, the Sprankleses argued they would suffer significant hardship because they would be unable to further develop their property. They presented engineering expert Steve Norris, who opined that the potential loss of the disputed area would "severely limit" their "ability to install a reserve septic system" and thus preclude them from building a "detached second dwelling unit."

The court found Norris's testimony "speculative and unconvincing" because there was no credible evidence that the Sprankleses intended to further develop their property, nor was there evidence that the county would authorize a "secondary dwelling unit anywhere on" their property. The court also noted Norris had failed to consider or address other feasible options and that he testified the cost of updating the Sprankleses' existing septic system would be significantly less than adding a new one in the disputed area. The

25

court concluded that Norris's testimony was "not credible to support" the Sprankleses' "hardship argument."

Based on these factual findings, the court concluded the substantial detriment to the Sullivans greatly outweighed the minimal costs to the Sprankleses, and that the "equities and hardships are patently in favor of the Sullivans."

In challenging the court's findings on appeal, the Sprankleses argue mainly that Valine's approximate $230,000 loss estimate is speculative because it improperly assumes the county will require the Sullivans to tear down their residence and build a new home. They emphasize that the Sullivans presented no evidence that the county would actually require them to "tear down their entire house and rebuild it." However, as summarized above, Valine's second estimate was not based on an assumption that the Sullivans would need to demolish their home. Instead, the estimate was based on the cost to *alter* the residence and property if the boundary line is moved.

After reviewing the record before us, we are satisfied the court had a reasonable basis to conclude that placing the boundary line within 10 feet of the home at a location where it would intersect their room addition (and their original roof) would likely require substantial alterations to the Sullivans' existing home and property configuration. The court did not abuse its discretion in finding the Sullivans were likely to suffer substantial monetary costs and difficulty using their residence if the court did not grant the equitable easement.

The Sprankleses argue the Sullivans had other places on their .6-acre property for parking, horses, and children. However, the court took these facts into consideration when nonetheless deciding the home would not be

useable in a practical sense with a boundary line so close to the front door. In arguing the court did not sufficiently consider its evidence of alternate locations, the Sprankleses are asking us to reweigh the evidence and reach a different factual conclusion. As an appellate court, we do not engage in this type of analysis. A reviewing court must draw all reasonable inferences to support the court's express and implied findings in a statement of decision. (*Adhav v. Midway Rent A Car, Inc.* (2019) 37 Cal.App.5th 954, 969.) The court's finding as to the hardship on the Sullivans was supported and we are bound by this finding.[3]

The Sprankleses additionally contend the court's balancing analysis was erroneous because the parties stipulated the easement area had a value to them of $40,053. However, the court had a reasonable basis to find this value did not reflect a substantial hardship because the Sullivans were ordered to compensate the Sprankleses for this loss and because it did not outweigh the considerable detriment to the Sullivans.

The court's statement of decision reflects that it understood the importance of the Sprankleses' property rights, but determined the Sullivans met their burden to prove "the hardship to the Sullivans [in having to remove the fence and leave the disputed area] *greatly outweighs* any prejudice to the

_____

[3]    At oral argument, the Sprankleses' counsel suggested even if there was sufficient evidence to support the hardship finding, the court should have declared a much smaller easement, rather than adopting the fence as the easement boundary (approximating the 37-foot setback reflected on the 1965 map). We agree the court could have done this, but do not find the court abused its discretion in reaching its conclusion. At trial, the Sprankleses urged the court to recognize the Ciremele survey line as the legal boundary (which it did) and reject, as unsupported, the establishment of an equitable easement. The Sprankleses did not identify an alternative footprint if the court determined the Sullivans met their burden to establish an equitable easement existed.

Sprankles[es]." (Italics added.) The court considered the relevant factors and its findings were supported by the evidence.

## VI. *Exclusive Easement*

The Sprankleses contend the court abused its discretion in granting an exclusive equitable easement to the Sullivans.

If the court finds the elements for an equitable easement, the court has broad powers to exercise its equity jurisdiction "to affirmatively fashion an interest in the owner's land which will protect the encroacher's use." (*Hirshfield, supra,* 91 Cal.App.4th at p. 765.) We review the court's choice of remedy only to determine whether it " ' "falls within the permissible range of options set by the legal criteria." ' " (*Id.* at p. 771; accord *Tashakori, supra,* 196 Cal.App.4th at p. 1008.)

The record supports the court's discretionary decision to grant an exclusive easement (with limited permissible uses) because the evidence supports that mutual use would not have been practical or possible. The Sprankleses' sole challenge to the exclusive nature of the equitable easement is to contend the easement was in effect a prohibited exclusive prescriptive easement.

Generally a prescriptive easement does not grant the user exclusive use over the servient tenement. (*Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1600-1601.) Thus, a prescriptive easement is an inappropriate remedy in "a garden-variety residential boundary encroachment" when the encroachment effectively prohibits the owner of the servient tenement from using his or her land. (*Harrison v. Welch* (2004) 116 Cal.App.4th 1084, 1093.)

The court made an express finding that the Sullivans did not prove a prescriptive easement because the court was "not persuaded that the possession was truly 'adverse' for the requisite period of time." The court also

cited three Court of Appeal decisions which it said rejected "the notion that a neighbor can obtain what is essentially a fee interest or an 'exclusive prescriptive easement' in residential boundary disputes by constructing encroachments on, or fencing off portions of, the adjoining landowner's property." (See *Raab, supra,* 51 Cal.App.3d 866; *Silacci, supra,* 45 Cal.App.4th 558; *Mehdizadeh, supra,* 46 Cal.App.4th 1296.) Relying on these three decisions, the court stated "the Sullivans could never obtain a prescriptive easement over the Sprankles Property simply by enclosing a portion of the Sprankles Property within their fence—no matter how long ago that fence was installed."

Relying on these same decisions, the Sprankleses argue the court erred in granting the exclusive easement because the easement granted "is so comprehensive that it is the equivalent of an exclusive prescriptive easement and/or transfer of fee title . . . ."

In *Hirshfield*, the court rejected a similar argument, explaining that because different requirements and rationales underlie the prescriptive easement and equitable easement theories, the fact that certain facts do not give rise to an exclusive prescriptive easement does not necessarily mean the same facts cannot support the creation of an equitable easement. (*Hirshfield*, *supra*, 91 Cal.App.4th at p. 770.) We agree.

A prescriptive easement requires a specific intent to dispossess the true owner; whereas an equitable easement arises only when the encroacher acted innocently and mistakenly believed the property was her own. (*Hirshfield, supra,* 91 Cal.App.4th at p. 770.) Additionally, the rationale underlying a prescriptive easement is "a preference for use, rather than disuse of land. [This form of easement] is designed . . . to reduce litigation and preserve the peace by protecting long-standing possession." (*Id.* at p. 769.) In contrast,

the policy underlying the creation of an equitable easement is a broader concern that seeks to "promote justice" under the particular circumstances. (*Id.* at pp. 769-770.)

Given these differences in the requirements and purposes of the doctrines, the holdings in *Raab*, *Silacci* and *Mehdizadeh* that each party could not—through adverse possession or a prescriptive easement—claim exclusive ownership of a neighbor's property do not apply in this case. (See *Hirshfield, supra,* 91 Cal.App.4th at pp. 767-771.) Moreover, the court did not provide the Sullivans with a full fee interest in the easement area as the court strictly limited the Sullivans to certain enumerated uses and activities on the property.[4]

DISPOSITION

Judgment affirmed. Appellants to bear respondents' costs on appeal.

HALLER, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

---

[4] Our conclusion that the court did not err in declaring an equitable easement also necessarily includes our determination that the court properly granted judgment on the Sullivans' fifteenth cause of action for declaratory relief, which (as the Sprankleses acknowledge) is "identical to" the Sullivans' equitable easement claim.



APPENDIX A



APPENDIX B