Filed 5/5/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TATANA SPICAKOVA ROMERO et al., <br><br>     Plaintiffs, Cross-defendants and Appellants, <br><br>     v. <br><br> LI-CHUAN SHIH et al., <br><br>     Defendants, Cross-complainants and Respondents; <br><br> U.S. BANK NATIONAL ASSOCIATION, <br><br>     Cross-defendant and Respondent. | B310069 <br><br> (Los Angeles County Super. Ct. No. EC064933) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Affirmed in part, and reversed in part.

McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Plaintiffs, Cross-defendants and Appellants.

Songstad Randall Coffee & Humphrey, Janet E. Humphrey and Elyn C. Holt for Defendants, Cross-complainants and Respondents.

No appearance by Cross-defendant and Respondent.

After a bench trial, the trial court resolved a property line dispute between two neighbors by creating an easement in favor of respondents, the encroaching property owners. It granted respondents an exclusive implied easement and, alternatively, an equitable easement over the entire 1,296-square-foot encroachment. Appellants appeal the judgment.

We reverse the judgment on the cause of action for implied easement, and affirm the judgment on the cause of action for equitable easement.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Two Properties at Issue*

The two neighboring properties at issue are located next door to each other at 643 West Algeria Avenue (643 property) and 651 West Algeria Avenue (651 property) in Sierra Madre, California.

Tatana and Cesar Romero (appellants) own 651 property. Li-Chuan Shih and Tun-Jen Ko (respondents) own 643 property. At times we refer to the 651 address as appellants' 651 property and the 643 address as respondents' 643 property.

B.    *Prior Owners' Application for a Lot Line Adjustment*

In 1941, Edwin and Ann Cutler (the Cutlers) purchased both properties. At the time of purchase, the 643 property was improved with a home, while 651 property was a vacant lot. The Cutlers resided in the house located at the 643 address with their son Bevon.[1]

---

[1]    When referring to Edwin, Ann, or Bevon Cutler individually, we use their first names to avoid confusion.

More than 40 years later, on February 4, 1985, Edwin submitted to the Planning Commission of the City of Sierra Madre (the City) an application for a variance, seeking a property lot line adjustment.  The lot line adjustment would have increased the width of respondents' 643 property from 50 to 58 feet, and reduced the width of appellants' 651 property (the vacant lot) from 63 to 55 feet.  The application asked, "How are other owners able to use their property that cannot be done on this lot at present?"—to which Edwin provided, "Driveway and fence line."

On February 21, 1985, the City's Planning Department recommended approval of the variance as requested.  The minutes from the Planning Commission's meeting held that day provide:  "Mr. Cutler told the Commission that the driveway is extremely narrow and he intended at the time of purchase to divide the property and adjust the width of the driveway."  The minutes further provide:  "In order to adjust the boundary line, Mr. Cutler will need an engineer-surveyed parcel map and must meet county regulations."  Finally, the minutes note Edwin's application is "[a]pproved; subject to city engineer review of parcel map and boundary line adjustment."  (Some capitalization omitted.)

Edwin thereafter retained the services of registered civil engineer John B. Abell (Abell) of John B. Abell, Inc., who prepared a survey and new legal description for the two properties, dated May 8, 1985.

The new legal description for respondents' 643 property, post lot line adjustment, included additional language:  "The west 50 feet of Lot 15 of Wheeler Heights, in the City of Sierra Madre, County of Los Angeles, State of California, as per Map recorded

3

in Book 8, page 5 of Maps, in the office of the county recorder of said County. [¶] *Together with the easterly 8.00 feet of Lot 'B' of Gurhardy Heights, as per Map recorded in Book 13, page 188 of Maps, in the office of the county recorder of said County, lying south of the easterly prolongation of the north line of Lot 12 of said tract.*" (Italics added; boldface and some capitalization omitted.)

Similarly, the legal description for appellants' 651 property, post lot line adjustment, contained additional language: "The east 35.2 feet of Lot 12 of Gurhardy Heights, in the City of Sierra Madre, as per Map recorded in Book 13, page 188 of Maps, in the office of the county recorder of said County, and all that portion of Lot 'B' of said tract lying south of the easterly prolongation of the north line of said Lot 12. [¶] *Except therefrom the easterly 8.00 feet, (measured at right angles to the easterly line), of said Lot 'B.'*" (Italics added; boldface and some capitalization omitted.)

The problem at the root of the parties' dispute is that there is no evidence the City ever reviewed or approved the survey and new legal description. A certificate of compliance was never executed by the City. Similarly, there is no evidence the lot line adjustment was ever recorded. But the Cutlers later acted as if the new legal description was operative.

C.   *Prior Owners' Improvements on 651 Property*

Later that year, in 1985, the Cutlers' son Bevon partnered with David Shewmake (Shewmake) to build a house on the vacant lot (appellants' 651 property) and sell it for profit. During construction of the house, Bevon and Shewmake built a six-foot-tall block wall between the two properties, along the new legal boundary line surveyed and described by Abell, but never certified by the City.

4

In May 1986, a Notice of Completion was issued and recorded for construction of the house on appellants' 651 property. The Notice stated a legal description of 651 property identical to the original legal description for the 63-foot-wide lot and not the reduced 55-foot-wide lot proposed in Edwin's application for variance. The legal description specified in the Notice did not include the additional language post lot line adjustment in the legal description/survey prepared by Abell: "*Except therefrom the easterly 8.00 feet, (measured at right angles to the easterly line), of said Lot 'B.'*" (Italics added, boldface and some capitalization omitted.)

D. *Transfers of Title from 1986 until 2014*

On May 9, 1986, the Cutlers recorded a grant deed transferring title to appellants' 651 property to Bevon and Shewmake, each receiving an undivided ½ interest as tenants in common. The legal description provided in the grant deed did not contain the additional language per Abell's legal description *after* the tentatively approved lot line adjustment. The legal description specified in the grant deed was again identical to the original legal description for the 63-foot-wide lot and not the reduced 55-foot-lot Edwin requested in his variance application.[2]

That same date, on May 9, 1986, Bevon and Shewmake executed a grant deed transferring title to 651 property to

---

[2] After conveying their interest in 651 property to Bevon and Shewmake in 1986, the Cutlers executed a series of wild deeds in 1989, 1992, and 1998 as to the "easterly 8.00 feet of Lot 'B'." These wild deeds were ineffective and not within the chain of title as the Cutlers no longer owned the property when they executed the deeds.

5

Manfred and Elizabeth Leong (Leongs).  The legal description on the grant deed again did not contain the additional language reflecting a lot line adjustment.

Twenty years later, on January 20, 2006, a grant deed was recorded transferring the 651 property from the Leongs to Dawn Hicks.  The legal description in the grant deed for the original 63-foot-wide larger lot was used again.

On April 9, 2014, a grant deed with the original lot dimensions was recorded transferring title of the 651 property to appellants.

Before closing escrow on the 651 property, appellants executed the California Residential Purchase Agreement, which includes the following provisions.  "Buyer acknowledges that the square footage of the Property has not been measured by Seller . . . (including the square footage of the lot and home) and the square footage quoted on any marketing tools . . . is deemed approximate and not guaranteed. . . .  Buyer is buying the Property AS IS, . . . WITH ALL FAULTS AND LIMITATIONS and Buyer acknowledges Buyer's responsibility to perform all due diligence and investigation regarding Buyer's acquisition of the Property, including the measurement or confirmation of the square footage of the Property."

On July 1, 2014, a grant deed was recorded transferring title to the 643 property to respondents Tun-Jen Ko and Li-Chuan Shih.  The legal description in the grant deed did not contain the additional language increasing their square footage as reflected in Edwin's lot line adjustment application.

The Seller Property Questionnaire—received, initialed, and signed by respondents on June 24, 2014—provided there are no "[s]urveys, easements, encroachments or boundary disputes"

6

regarding 643 property. The Buyer's Inspection Advisory initialed and signed by respondents on May 20, 2014 provided: "The physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers. For this reason, you should conduct thorough investigations of the Property personally and with professionals who should provide written reports of their investigations." The Buyer's Inspection Advisory further provides: "YOU ARE ADVISED TO CONDUCT INVESTIGATIONS OF THE ENTIRE PROPERTY, INCLUDING BUT NOT LIMITED TO . . . Square footage, room dimensions, lot size, age of improvements and boundaries. . . . Fences, hedges, walls, retaining walls and other natural or constructed barriers or markers do not necessarily identify true Property boundaries. (Professionals such as appraisers, architects, surveyors and civil engineers are best suited to determine square footage, dimensions and boundaries of the Property.)" (Boldface omitted.)

E.    *Appellants' Civil Complaint*

On February 10, 2016, appellants initiated a civil action against respondents. The operative third amended complaint, filed on May 22, 2019, alleged causes of action for wrongful occupation of real property, quiet title, trespass, private nuisance, wrongful disparagement of title, and permanent injunction.

The complaint alleged the following: "One of the main reasons [appellants] purchased [the 651] property was because it was advertised to have an approximately 10,000 square foot lot." In June 2015, appellants retained licensed land surveyor James Kevorkian (Kevorkian) to prepare a survey of the boundaries of their property. Appellants were then made aware that respondents were "encroaching" onto their property. The total area encroached upon is a strip of land measuring approximately

8.25 feet by 157.14 feet, totaling 1,296 square feet, "or approximately 13% of [appellants'] total land area which they legally own and on which they have paid and continue to pay property taxes." The encroaching area include the block wall between the two properties, respondents' planters near the front sidewalk, and a portion of respondents' driveway parallel to the misplaced wall. Respondents' purchase of the neighboring 643 property did not include any easement, as "the Seller's Transfer Disclosure Statement and other sale documents . . . did not disclose any encroachments or easements." In July 2015, appellants asked respondents to remove the encroachments and "share in the cost of building a new fence on the property line" but respondents "refused to do so."

Appellants argued respondents' encroachments prevent them from entering or using approximately 1,296 square feet of their land; this "continuing trespass" continues to result in damage "on a daily basis" depriving appellants of their "right to exclusive possession and peaceful enjoyment" of their property. Respondents have "no right, title or interest" in or to appellants' property that "would lawfully allow them . . . to enter upon and use any portion of" appellants' property. Appellants believed they "are entitled to a permanent injunction" requiring respondents to remove all encroachments. As a result of respondents' actions, appellants have suffered and continue to suffer general, compensatory, and consequential damages in an amount no less than $300,000.

F.    *Respondents' Cross-Complaint*

On May 5, 2016, respondents filed a cross-complaint against appellants for implied easement, equitable easement, quiet title, and declaratory relief.[3]

The cross-complaint alleged appellants' and respondents' neighboring properties "were in the past owned by the same owner(s)" who "installed pavement and built a wall, planters and other improvements on the properties, which currently exist on the properties." The prior "owner(s) made a variance request with the City of Sierra Madre to create two parcels and widen the driveway for [respondents' property]." The improvements "have existed since 1985, and [respondents] and their predecessors in interest have used the [i]mprovements without complaint since at least that time." Appellants "threaten to remove the [i]mprovements and build a new fence on the property line . . . which would impact [respondents'] use and enjoyment of [their property]." Respondents "will suffer irreparable harm if they are not granted an easement" over the improvements located on appellants' property "because the value of [respondents' property] would be significantly diminished and the driveway . . . would not be wide enough to access [respondents' property]." Respondents argued this created an equitable easement over appellants' property in the area of the improvements.

Respondents also argued the "acts of the prior owner[s]" of the properties "created an implied easement," referring to the variance request, the separation of title to the properties, the

---

[3]    Respondents also named appellants' lender, U.S. Bank National Association, as a cross-defendant so it would be bound by any judgment awarding an easement.

9

"obvious and permanent use of the [i]mprovements for the benefit of" respondents' property, and "[r]easonable necessity of the use giving rise to the easement."

Respondents sought "to quiet title to an equitable easement and/or an implied easement" over appellants' land; they requested the easement run with the land and be binding on all successors-in-interest. They requested "a judicial determination of their rights and remedies . . . relating to the parties' claims." In addition, respondents requested appellants pay for respondents' "out-of-pocket expenses and other administrative, investigative, and ancillary expenses incurred."

G.     *Trial*

A five-day bench trial took place on March 9, 10, 11, 12, 2020 and June 30, 2020.

An important exchange took place between the parties and the court on the second day of trial. The court stated: "It seems to me that everybody is in agreement that if the easement were either—if there were an easement in favor of the 643 property, that is essentially for exclusive use. [¶] . . . [¶] . . . I mean, it would be, with regard to an easement, an exclusive use. It's not like the Romeros are going to every so often hop over the fence and walk along there because they own the property." Counsel for respondents responded: "I agree with that statement, your honor." The court further stated, "I'm not really thinking you are getting much pushback on the factual matter that if an easement were to arise by implication, generally speaking the use of that easement by the property owners of 643 have it for largely exclusive purposes."

The evidence at trial established no real dispute about the basic historical facts; the evidence fell into two categories.

10

Besides establishing the City's zoning and variance requirements and the extent of the encroachment, the testimony focused on the effect of the encroachment on the parties. This was developed through the testimony of appellant and several expert witnesses.

1.    Zoning and Variance Requirements and Extent of Encroachment

Vincent Gonzalez (Gonzalez), the Director of Planning and Community Preservation for the City, described the procedure for obtaining a lot line variance in 1985: "[T]he matter would go before the Planning Commission. They would make the decision to deny or recommend. Once that is done, then the applicant submits for the lot line adjustment or subdivision. [¶] And the documents would include a recorded survey and, also, a legal description of the intended division of lots at the conclusion of the subdivision, and, also, a certificate of compliance would be required to be completed and signed by the property owner, the Director of Public Works, the Director of Planning and Community Preservation, and the city engineer." "Usually what occurs is the property owner or city engineer, the public works director, and, in some cases, the planning director, will sign a certificate of compliance stating that everything—the legal description has been prepared, the plat map has been prepared, and has been reviewed and evaluated by the city [engineer], confirmed all those findings. [¶] The certificate of compliance is signed [and] given to the property owner for recordation of the county."

Gonzalez confirmed he found in the City's files a copy of Edwin's 1985 application for a variance request. He confirmed the application requested a lot line adjustment. He confirmed the Planning Commission recommended approval of the variance,

11

subject to conditions. "[B]efore the [variance], the granting of the lot line adjustment is the first step in the process, and then the property owner subsequently obtains a survey, a record of survey, legal description. And that would ultimately be reviewed by the city engineer." The property owner "would need to obtain [a civil] engineer to survey the parcel." The property owner "would have submitted [the record of survey and legal description], after it was prepared by the civil engineer, to the public works department to the city engineer for review."

Gonzalez did not know "whether the city engineer ever reviewed . . . the site plan and the legal description" prepared by Abell. He stated: "It appears that there was a survey completed. There is also that a legal description was prepared. But I see no evidence that the certificate of compliance was ever signed and recorded." He confirmed no lot line adjustment was recorded; however, he also confirmed he did not see anything in the City's files indicating Edwin had withdrawn his variance application.

In 2014, the City required new construction to have a driveway width of 10 feet; this remains the driveway width requirement for the City. The City "consider[s] a 10-foot-wide driveway reasonable."

In terms of parking space requirements, this residential zone requires "[t]wo spaces per dwelling unit in a garage or carport." Respondents' 643 property, thus, must have two parking spaces in a garage or carport. In terms of parking, James Guerra, a building inspector for Building and Safety for the City for approximately 22 years, confirmed that the City's overnight parking ordinance allows residents to obtain overnight parking permits for the annual fee of $97.

12

Yuchi David Tsai (Tsai) was respondents' real estate agent in connection with their purchase and management of 643 property. He showed the property to respondent Ms. Shih sometime in May 2014. He believed the property line was where the "block wall [was] up." He also believed the front planter box was part of 643 property because "the planter box material [was] the same thing, consistent throughout the 643 [property]." Tsai recalled explaining the seller's purchase agreement and real estate transfer disclosure agreement to respondents, and "after [he] explained, Ms. Shih sign[ed] the agreement." Tsai confirmed reviewing the preliminary title report with respondents; he also confirmed the preliminary title report specified 643 property lot was 50 (not 58) feet wide. He was not aware of any encroachments or easements affecting either property at the time respondents finalized the transaction.

Tsai discovered the property line issue when appellants came to his office in 2015 and informed him of the survey findings. The next day, Tsai went to the City and "learned the same owner owned the other side, and then there was a subdivider to build the other property." He saw the Planning Commission's meeting notes and recalled "it described the variance was approved" and thus, he concluded "the block [wall] was built on the new property line." When he informed respondents of the circumstances, they were "surprised."

David Knell (Knell), a licensed land surveyor, researched the L.A. County Surveyor's website, viewed the survey history and historical maps, reviewed Kevorkian's record survey of 651 property, and conducted a field survey of the two properties. He concluded the following improvements on respondents' 643 property encroach onto appellants' 651 property: portion of the

13

driveway, the planter, and the air conditioner unit attached to the side of the garage located at the back end of the driveway behind the house. The width of the encroachment totals 8.7 feet, and the total square footage of the encroachment is 1,296. The distance from the side of the garage on 643 property to the true property line is 0.8 feet, i.e., about 10 inches. The air conditioner "sticks out from" the side of the garage "into the 651 property, and that dimension is 1.2 feet." Should the property line reflect what is in the deeds, the width of the driveway on respondents' 643 property at its narrowest point is 7.2 feet.

Knell confirmed that the survey map prepared for Edwin by Abell did not have Abell's stamp or seal on it. Every parcel map that Knell has ever prepared and recorded in any county recorder's office in California "had to have the stamp or seal for the licensed surveyor or the civil engineer who is taking responsibility for that document," as that is "clearly stated in the Subdivision Map Act." A completed lot line adjustment requires a recorded parcel map/deed, and recordation requires the stamp or seal on the map/deed. Knell has never seen a parcel map or subdivision map without a stamp or seal for the licensed civil engineer or land surveyor who had signed it. He referred to Abell's survey map as a "draft," that is, "it just was not a finished product, so I think 'draft' is an appropriate word."

Catherine Connen (Connen), the president and principal civil engineer at John B. Abell, Inc., is a registered civil engineer and has worked with her father, John B. Abell, since 1982. Her father's business maintained accounts receivable records in the ordinary course of business. It was the custom and practice of the company in 1985 to maintain records reflecting amounts billed, amounts owed, and amounts paid by customers.

Payments received from customers were recorded in the accounts receivable ledger.

Connen brought with her to court "the actual original ledgers for the period of 1985." A page from the ledger provided the job number ("2-1452"), the client ("Ed Cutler"), the site address or street ("Alegria Ave"), the amount billed ("$165"), and the date billed ("6-4-85"). It also provided space to specify the amount paid by the client and the date paid, but those areas were left blank next to Cutler's name, possibly meaning the amount owed was not paid.

2.      Effect of the Encroachment

Then a battle of expert witnesses ensued.

Steven McCormick (McCormick), a licensed commercial general contractor, analyzed the feasibility of the property line easement being vacated and its effects "on the viability of the home."

The City had enacted a 10-foot minimum driveway width for properties located in R1 zones in the City. The 643 property is located in an R1 zone. The City also had setback requirements for properties in R1 zones: "The front-yard setback is 25 feet, the side-yard setbacks are 5 feet, and the rear-yard setback is 15 feet." Additionally, zoning ordinances in R1 zones in the City required two covered parking spaces.

McCormick gave his opinion on how respondents' 643 property would be impacted if it did not have use of the entire encroachment area: "Well, obviously, the width of the driveway would be reduced. The section going along the length of the home would be down to 7.2 feet," which did not comply with the City's current zoning codes. If the driveway width was 7.2 feet, "[y]ou would be very limited on the cars that can get through there. It

15

would really boil down to subcompacts and . . . a certain percentage of compact cars. But midsize and full size cars either [w]on't fit or would be extremely tight getting through there." He determined the foregoing by looking up car dimensions on the website automobiledimension.com. He concluded that a Toyota Prius would fit through a 7.2-feet-wide driveway, a Tesla Model S (the smaller Tesla) would just barely fit with the side-mirrors retracted, but the Tesla Model X (the largest Tesla) would not fit. Additionally, he believed one would be unable to open the doors and exit a car in a 7.2-feet-wide driveway. "[E]ven with a Toyota Prius, you could not get out of the car between the house and the wall, but . . . once you get back to the garage, there is room back there."

He opined on alternative ways to widen the driveway for respondents' 643 property in the event the block wall was moved to reflect actual property lines. He came "up with the possibility of tearing off the side of the house and moving the footings and [to] reframe the house back about 4 feet from its existing position." He believed respondents "certainly would be able to widen the driveway, but it creates a couple of problems. The first problem, besides cost, is the fact" that moving the wall over would cause the secondary bedroom to "shrink down to the point where it violated the L.A. County habitability requirements." To constitute a bedroom, the room must be at least 100 square feet, but moving the wall over would cause the secondary bedroom to be less than 100 square feet. Per McCormick, the total cost of the demolition and rebuild was $99,120.27.

McCormick also offered his opinion on how the garage on 643 property would be impacted. "[I]f the easement area was removed and a new wall was put up along . . . the property line

16

that's in contention here, essentially, you would have just a few inches between that fence and the left-side exterior wall of . . . the garage." Thus, "two things would occur. One, there is an area for parking. [There] was a camper trailer unit there before. You would lose that [parking area]." Two, "[t]here is an air-conditioning unit that's been mounted on the side of the [garage] wall, which you can see on the left-hand side, protrudes into that space. So the fact that there is only a few inches, you cannot repaint or maintain that exterior wall." If the block wall was moved to the property line, the distance between the block wall and the garage wall would not comply with the City's five-foot setback requirements.

He performed a cost estimate to move the garage over to accommodate the five-foot setback requirement of the City and reached the total cost of $73,343. The garage would need to move "somewhere between 5 and 6 feet" to comply with the five-foot setback requirement. The effect of moving or shrinking the garage by five or six feet would result in the garage "being about like 12 to 14 feet wide," which would be enough to comfortably fit one vehicle, but not two. He determined another alternative would be to "do a carport in front of the garage, but you end up essentially parking tandem. So one [parking spot] would be inside the garage and one [parking spot] would be outside in the carport." Finally, he provided a cost estimate of $2500 for relocating the air-conditioning unit from the side of the garage.

Next, licensed professional land surveyor Kevorkian determined the width of the encroachment area as 8.25 feet and the length as 157.13 feet from front to rear. The total square footage of the encroachment totaled 1,296.32 square feet.

17

He confirmed the land survey he prepared for appellants had his stamp on it. When asked why he put his stamp on it, he answered, "Because it's legal. It makes it legal." ~(RT 401; 4AA 520)~

Steve Helfrich (Helfrich), a licensed general contractor, civil engineer, and geotechnical engineer, also testified about the width of the driveway. The driveway width at its narrowest is 7.2 feet for a length of about 27.5 feet—where the driveway borders respondents' residence. The driveway gets wider as it approaches the back garage and is wider at the sidewalk near the planter box.

Helfrich opined that a 2018 Toyota Prius (with a width of 69.3 inches) would be able to make a multipoint turn in the 20-foot-by-20-foot area in front of the garage and then go back down to the street via the driveway. If the property line were moved to reflect true lot lines, "the width of the driveway is 86 inches, and the width of the Prius without the mirrors is 69 inches. So you have—it depends on how wide the mirrors are, but I think that there's more than a few inches on each side." Besides the 20-by-20 area where a car may maneuver around, the only other way to get in and out of the garage would be to back out of the driveway. When asked why he chose only to concentrate on a 2018 Toyota Prius in his analysis, Helfrich answered: "That was, I felt, representative of a compact car."

Gidon Vardi (Vardi), a certified building inspector and construction and safety consultant with a general contractor's license, reviewed McCormick's cost estimate report. which essentially "calls for complete demolition and rebuilding of [respondents'] property and dwelling" as well as "the garage and

18

adjacent structure." Vardi believed McCormick's estimates were simply "excessive and unreasonable."

Daniel Poyourow (Poyourow), a licensed real estate appraiser and real estate broker, had prepared diminution in value appraisals, including in the Sierra Madre area. A diminution in value appraisal is based upon the before and after condition of a property.

Poyourow analyzed and valued appellants' 651 property "before, and then after, [he] considered the loss in land use, and valued the land separately. [He] [a]llocated a certain portion of the land to the easement area, and . . . diminished the value based upon a loss of certain rights and uses." He collected comparable sales data on land and improved properties, prepared an adjustment grid, analyzed the data, and drew the following conclusions.

Using the sales comparison approach, he set the value of appellants' 651 property, including the area of the encroachment, at $1.310 million. He placed the land value of the property at $710,000. He calculated the diminution in value from losing the encroachment area measured at 1,224 square feet as $68,264. Relying on Kevorkian's square footage of 1,296 square feet, the diminution in value increased to $71,000.

Poyourow "examined what rights or uses would remain to [appellants'] 651 property." He opined some uses do remain, even though the property is used primarily by respondents. He set the diminution in value as a result of the encroachment at $67,000; thus, the net value of appellants' 651 property, after subtracting out the diminution in value, was $1.243 million. He added that appellants' 651 property could support another 300 square feet of

19

structure which is "really important and a big value to the 651 property."

As for respondents' 643 property—with a lot size of 7,853 square feet without the encroachment and 9,072 square feet with the encroachment—Poyourow used the sales comparison approach and set the value of the property with the encroaching area at $915,000. He calculated the value of the encroachment area itself at $67,000. He valued respondents' property without the encroachment area at $782,000, with a total diminution of $133,000 (or $137,000 for 1,296 square feet).

Poyourow looked at the hardship or burdens that respondents' 643 property would experience as a result of losing the encroachment. "[T]hey would lose some parking because the driveway would become so narrow." "They would also lose that open third parking space." He opined the cost to replace a second and third open parking space would be $19,000 each; he opined loss of the garage parking resulted in a $15,000 reduction in value for the two spaces, totaling $53,000 for loss of parking. He conceded a resident can park on the street overnight with an annual permit costing less than $200. He also conceded the loss of the planter box "is primarily an aesthetic issue, just the planter boxes themselves. [He was] more concerned with the driveway issues." Finally, he estimated $2,500 as the cost of relocating the air conditioning unit on the side of the garage.

In his appraisal, Poyourow stated the subject encroachment area is "effectively exclusive." "The surface area is being exclusively used [by respondents] right now." The potential for any remaining use by appellants "is remote." He stated that the prospect of appellants installing new pipes underneath the encroachment area "would be remote, but it is possible to do."

20

David Harding (Harding), a licensed real estate appraiser in central California, also calculated the diminution in value for each property. Using the sales comparison approach, he appraised appellants' 651 property including the 1,296 square foot encroaching area at $1.375 million. Without the disputed area, his appraised value was $1,264,840. He attributed $110,160 as the value of the 1,296-square-foot encroachment area.

Harding took his diminution in value calculation one step further by analyzing the "diminution of value to the property over and above the value of the land." He calculated a diminution of value for appellants' property of 15 percent, which amounted to an even lower total appraised value of $1.075 million. And the "total difference between the value in the before condition and the value in the after condition" is $300,000. When asked how he reached the figure of 15 percent, he stated: "This is too convoluted. I come across this type of thing a lot in my diminution of value analysis appraisals. They're complicated issues, and admittedly there's unfortunately no way to support them accurately with market data. [¶] So I thought about it a lot, and I came to—you know about 10 percent, that seems a little low. I think that's more than that. 20 percent seemed high. 15 percent is in the middle of that. It seemed like a comfortable figure. I calculated what that equated to in terms of a dollar value."

Finally, appellants Cesar and Tatana Romero testified about their damages. The advertised lot size for the 651 property was very close to 10,000 square feet. The lot size was appellants' main criteria and they would not have purchased the 651 property if it had been advertised as an 8,500-square-foot lot.

The fact that there was an encroachment from the adjacent property was never disclosed to appellants when they purchased the 651 property.

Before purchasing the property, Cesar noted the house was "in bad condition" so his inspection of the property and "main focus was on the house"; he did not look at the block wall or the neighboring property. A year after purchasing 651 property, Cesar "was doing some work in the front to improve [his] yard, and [had] to do some measurements to order some building materials." "When [he took] the measurements, it didn't seem like the right width of the yard." Appellants hired James Kevorkian who prepared a survey and informed them of the encroachment. Appellants wanted to resolve the encroachment issue without court intervention. They contacted Tsai about the issue, but Tsai was "dismissive." The next day, Tsai informed appellants of his findings from the Planning Commission meetings and the lot line adjustment request.

Since appellants' purchase of 651 property, they have paid property taxes on the property, including the nearly 1,300-square-foot disputed land. Since their purchase of the property, they have not been able to use that 1,300 square feet for any purpose; they are, in fact, physically prevented from using or accessing it because of the block wall. As things stand now, appellants have conceived no plans for use of the disputed area. However, they have ideas for use of the disputed land should they get it back. Cesar testified, "[W]e would like to be able to have more area there so that we can increase our privacy. We would like to plant . . . in the front. . . . My wife wants to plant an orchard. I would like to place a pool in the back." Appellants have "been in this lawsuit for—going on almost five years now

and spent maybe close to $300,000 in order to actually be able to assert the rights of something that I've actually bought. [¶] I mean, I bought a lot of almost 10,000 square foot, and it was important to us to have a large lot, and it's still important to us. Because it's our land, and I believe in property rights."

Tatana echoed her husband's testimony. She testified, "13 percent of [her] property" is being exclusively used by the occupants of 643 property. "I believe in our constitutionally protected property rights I have bought, paid for, and legally own the approximate 10,000-square-foot lot." As it currently stands, she is "precluded" from utilizing the 1,296 square feet in any way. Yet, she and her husband would be exposed to the potential of unlimited and perpetual liability for "any injuries that might happen on an area over which I have no control." She gave an example of how there are a lot of young children living on West Algeria Avenue between "the ages from zero, newborns, to 5, 6, 7 years old, and they play a lot on West [Algeria] Avenue. They are running around, learning how to ride a bicycle, tricycle. They are using the sidewalk quite a bit." "[W]hat could happen is that the young child could trip over a loose brick or something that the tenants of the 643 property would do, and if that child happens to trip and suffer, God forbid, a catastrophic brain injury or paralysis, I will be exclusively personally liable for being responsible for those injuries because I'm the legal owner of that particular strip of land, and that is a huge problem."

Appellants had title insurance with First American Title Insurance Company. After respondents filed their cross-complaint, First American Title Insurance Company paid appellants $95,000 for their loss of use of the encroachment area.

H.    *Statement of Decision*

On August 24, 2020, the trial court issued its proposed statement of decision. Respondents requested one clarification, which the court adopted. Appellants raised 53 objections to the proposed statement of decision and requested additional and alternative findings. We note appellants' Objection No. 22, where they objected to trial court's granting of the easement as it is "essentially permanent" and "not narrowly drawn to promote justice."

On September 28, 2020, the trial court filed its statement of decision and concluded respondents "possess an implied easement over the eight-foot strip of land." The court further concluded that if there were no such implied easement, an equitable easement should arise, which would entitle appellants to compensation of $69,000.

The court's lengthy statement of decision provided, in relevant part:

Implied Easement

The court found "all the conditions exist for an implied easement in favor of the 643 Property over the eight-foot strip of land." The easement "shall run with the land, and, consistent with the original grantor and grantee's intent in 1986, shall terminate if the 643 Property ceases its continued use of the easement for a driveway, planter, and wall/fence."

The court also found "the continued encroachment onto the disputed strip of land is reasonably necessary" and referred to the fact that the 643 property's driveway would measure 7.2 feet at its narrowest point, which fell several feet short of the City's minimum driveway width requirement of 10 feet.

The court found the implied easement "is not necessarily 'exclusive,' as various subsurface uses (e.g., running underground pipes or cables) are available to the 651 Property."

Equitable Easement

The court found "all three factors for the creation of an equitable easement are present" and exercised its discretion to impose a "judicially created, equitable easement over the strip of land . . . for the 643 Property to maintain a driveway, planter and wall/fence [that] should run with the land, but should terminate if the 643 Property were to cease its continued use of that land for a driveway, planter and wall/fence."

The court found respondents were "innocent parties with no knowledge of the encroachments and no basis to know of them." The court further found appellants "would not suffer any irreparable harm from such continued encroachment." While appellant Cesar Romero "testified generally that removal of such encroachments would afford him greater privacy and the ability to plant trees and/or build a pool in his backyard, there was no evidence at trial of any actual plans [appellants] had to increase privacy, landscape, or construct a pool that their lot in its current state would prevent or adversely affect in some substantial manner."

While appellants argued "the continued encroachment . . . burdens them because they continue to pay property taxes for land being used by another", there was "no evidence . . . concerning property taxes [appellants] actually pay for the 651 Property and what, if any, unfair tax burden [they] assume for the strip of land they cannot fully use." Regarding the "potential legal liability for the strip of land," the court believed "any such liability (or pecuniary damage flowing therefrom) is too

speculative and uncertain to carry much weight." "Largely, it appears to the Court that any harm to [appellants] is emotional or psychological. . . . [W]hile the hardship to [appellants] may be felt substantially by them, it is greatly outweighed by the actual harm [respondents] would suffer absent an easement over the strip of land."

The court referred to McCormick's testimony about "the impracticality and great expense of alternatives to the easement" and found there is no "viable, reasonable alternatives to an easement." The court "rejects the testimony of . . . Helfrich, who opined that the driveway on the 643 Property could continue to be used even if it were narrowed to the actual property line" as his opinion "was based solely on . . . one car—a 2018 Prius." The court also "found unhelpful the testimony of . . . Vardi" as he "did not meaningfully explain how he arrived at [construction and repair] costs." The court found Harding's testimony about the diminution in value to the properties "wholly unreliable and entirely unconvincing" as he "had never previously appraised any property in Sierra Madre" and had "only conducted two diminution in value appraisals involving encroachments ever." The court found Harding's testimony "either should have been excluded or stricken in its entirety for lack of foundation and reliability or should be disregarded and afforded no weight to the extent it was admissible."

The court considered the diminution in value to the respective properties. The court viewed Poyourow's testimony "the only competent evidence of such diminution in value." The court referred to Poyourow's conclusion that the "effect of an easement over the disputed area would be a diminution of value to the 651 Property of $67,000, or an additional $4,000 if using

26

the slightly greater square footage calculation of [appellants'] survey for the area of encroachment" and $133,000 as the diminution in value to the 643 property without the easement. "[T]he balance of hardships greatly favors [respondents]."

The court found appellants entitled to compensation if subject to the equitable easement, and found "the best measure of damage . . . is the diminution in value to their property." The court credited Poyourow's calculations and split the $4,000 additional amount based on the square footage difference, and "conclude[d] that $69,000 would constitute just compensation to [appellants] for the creation of an equitable easement."

### Remaining Claims

Having found an implied easement in favor of respondents' 643 property, the court found the easement dispositive of the remaining claims in the third amended complaint and the cross-complaint.

On October 26, 2020, the trial court filed its judgment and appellants timely appealed.

## DISCUSSION

Appellants make three primary arguments on appeal. First, they argue the trial court's judgment "should be reversed because, as a matter of law, the court cannot create an exclusive implied easement." Second, appellants argue "[a]ssuming implied exclusive easements are permissible, the court erred in creating an implied easement." Appellants believe substantial evidence does not support the court's findings as to the elements for implied easement. Third, appellants contend the court abused its discretion and "erred in creating an equitable easement" which "is not narrowly tailored to promote justice and

is significantly greater in scope and duration than what is necessary to protect [respondents'] needs."

We address appellants' first two contentions in part B and their third contention in part C.

## A.     *Easements, Generally*

An easement is a " 'restricted right to *specific, limited, definable* use or activity upon another's property, which right must be *less* than the right of ownership.' " (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702, first italics added (*Scruby*).)  An easement gives a nonpossessory and restricted right to a specific use or activity upon another's property. (*McBride v. Smith* (2018) 18 Cal.App.5th 1160, 1174.)  An easement "is not a type of ownership, but rather an 'incorporeal interest in land . . . " 'which confers a right upon the owner thereof to *some* profit, benefit, dominion, or lawful use out of or over the *estate* of another.' " ' " (*Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1032 (*Hansen*).)  The key distinction between an ownership interest in land and an easement interest in land is that the former involves possession of land whereas the latter involves a limited use of land.  (*Ibid*.)

Civil Code section 801 provides a list of 18 types of "land burdens, or servitudes upon land . . . as incidents or appurtenances . . . called easements" including, among other things, the right of pasture; the right of fishing; the right of taking game; the right-of-way; the right of taking water, wood, minerals, and other things; and the right of using a wall as a party wall.  (Civ. Code, § 801.)

"The general rule is clearly established that, despite the granting of an easement, the owner of the servient tenement may make any use of the land that does not interfere unreasonably

28

with the easement." (*Pasadena v. California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 579 (*Pasadena*).)  The owner of the dominant tenement must use his/her easements and rights in such a way so as to impose as slight burden as possible on the servient tenement.  (*Scruby*, *supra*, 37 Cal.App.4th at p. 702.)

B.    *The Court Erred in Granting an Exclusive Implied Easement that Amounted to Fee Title.*

1.    <u>Standard of Review</u>

The party claiming an implied easement has the burden of proving each element of the cause of action by a preponderance of the evidence, and the factual findings of the trial court are binding on the appellate court if supported by substantial evidence.  (*Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1419 (*Thorstrom*); *Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 145; *Orr v. Kirk* (1950) 100 Cal.App.2d 678, 684 (*Orr*).)  The court looks to all facts, the situation of the parties and the properties, and the circumstances surrounding the transaction to determine, as a question of fact, whether the parties intended to create the easement.  (*Tusher*, at pp. 144–145; *George v. Goshgarian* (1983) 139 Cal.App.3d 856, 861–863; *Piazza v. Schaefer* (1967) 255 Cal.App.2d 328, 332.)

2.    <u>Applicable Law</u>

Under certain circumstances, the law implies that the parties intended to create or transfer an easement by a grant or reservation when there is no written document evidencing their intent and, in some cases, even when there is no oral agreement regarding the easement; thus, implied easements are "an exception to the general rule that interests in real property can

29

only be created by an express writing or prescription." (*Kytasty v. Godwin* (1980) 102 Cal.App.3d 762, 768.)

Implied easements are not favored. (*Thorstrom, supra,* 196 Cal.App.4th at p. 1420; *Horowitz v. Noble* (1978) 79 Cal.App.3d 120, 131 (*Horowitz*).) The factual circumstances that permit the creation of implied easements are fairly well established and the implication can only arise where certain facts are present. (*County of Los Angeles v. Bartlett* (1962) 203 Cal.App.2d 523, 529–530; *Orr, supra,* 100 Cal.App.2d at p. 681; *Navarro v. Paulley* (1944) 66 Cal.App.2d 827, 829 (*Navarro*).) The courts jealously guard against any unreasonable or inequitable extensions of these rules beyond their original objectives. (6 Miller & Starr, Cal. Real Estate (4th ed. 2021) § 15:19.)

Civil Code section 1104 provides the circumstances under which the law implies the existence of an easement: "A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed." (Civ. Code, § 1104.)

In contrast to a *non-exclusive* easement, wherein the servient owner (in this case, appellants) may continue to use the easement area so long as such use does not unreasonably interfere with the use by the dominant owner (here, respondents), an *exclusive* easement only permits the dominant owner to use the easement area. (*Scruby, supra*, 37 Cal.App.4th at pp. 702–703.) Granting an exclusive easement in effect strips

the servient estate owner of the right to use the land for certain purposes, thus limiting the fee title; therefore, exclusive easements generally are not favored by the courts. Prior courts have referred to exclusive easements as "rare" (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 769, fn. 11 (*Hirshfield*)) and as "an unusual interest in land; it has been said to amount almost to a conveyance of the fee." (*Pasadena, supra,* 17 Cal.2d at p. 578.)

Until recently, exclusive easements were found principally in older utility easement cases. (See, e.g., *Salvaty v. Falcon Cable Television* (1985) 165 Cal.App.3d 798, 804.) However, more recent cases have upheld exclusive easements in situations where the express language of the granting instrument either uses the phrase "exclusive easement" (*Gray v. McCormick* (2008) 167 Cal.App.4th 1019, 1025–1026 (*Gray*)) or the parties intend that the dominant owner's use necessarily must be exclusive (e.g., an easement " 'for parking and garage purposes' "). (*Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1599–1600 (*Blackmore*).) Thus, so called "exclusive easements" are not prohibited under California law so long as the language of the creating instrument clearly expresses an intention that the use of the easement area shall be exclusive to the dominant owner. (*Gray*, at p. 1032.) In other words, an easement is nonexclusive unless it has been made exclusive by the express terms of the instrument creating it or the parties have evidenced their clear intent that it is exclusive. (*Pasadena, supra,* 17 Cal.2d at p. 578–579; *Otay Water Dist. v. Beckwith* (1991) 1 Cal.App.4th 1041, 1047 & fn. 4 (*Otay*); 6 Miller & Starr, Cal. Real Estate (4th ed. 2021) § 15:65.)

### 3.    Analysis

We note this is a case of first impression as we have found no case that permits or prohibits *exclusive* implied easements. We have reviewed case precedent regarding exclusive easements generally, and note the following.

In most cases involving *prescriptive* easements, the courts have not allowed the easement owner exclusive use (equivalent to fee title) of the servient tenement.  (See, e.g., *Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296, 1305–1307 (*Mehdizadeh*); *Silacci v. Abramson* (1996) 45 Cal.App.4th 558, 562–564 (*Silacci*); *Hansen, supra*, 22 Cal.App.5th at pp. 1033–1035; *Raab v. Casper* (1975) 51 Cal.App.3d 866, 876–877.)  "The notion of an exclusive prescriptive easement, which as a practical matter completely prohibits the true owner from using his land, *has no application to a simple backyard dispute* . . . .  An easement, after all, is merely the right to cross the land of another . . . is not an ownership interest, and certainly does not amount to a fee simple estate."  (*Silacci*, at p. 564, italics added; see *Pasadena, supra*, 17 Cal.2d at pp. 578–579.)  Similarly, an adjoining property owner cannot obtain the equivalent of adverse possession (and exclusive use of neighboring property) by alleging the elements of a prescriptive easement.  (*Hansen*, at p. 1033.)  "Unsurprisingly, claimants have often tried to obtain the fruits of adverse possession under the guise of a prescriptive easement to avoid having to satisfy the tax element.  [Citations.]  That is, they seek judgments 'employing the nomenclature of easement but . . . creat[e] the practical equivalent of an estate.'  [Citation.]  Such judgments 'pervert[ ] the classical distinction in real property law between ownership and use.' "  (*Ibid.*)

In *Kapner v. Meadowlark Ranch Assn.* (2004) 116 Cal.App.4th 1182, a survey showed that some of Kapner's improvements including portions of his driveway, gate, and perimeter fence encroached on another's parcel. (*Id.* at p. 1186.) The Court of Appeal affirmed that Kapner could not acquire an exclusive prescriptive easement over neighboring land by enclosing that land with a fence. (*Id.* at pp. 1186–1187.) The court further found Kapner's use of the neighboring land was not in the nature of an easement; instead, the landowner had enclosed and possessed the land. (*Ibid.*) The landowner could not establish adverse possession because he had not satisfied the necessary requirement of paying taxes for the enclosed land. (*Id.* at p. 1187.) "[A]dverse possession may not masquerade as a prescriptive easement." (*Id.* at p. 1185.)

*Mehdizadeh* is similar to the facts of the case before us, as it also involved a dispute between neighbors after discovery that a fence built many years earlier was not located on the legal boundary between their properties. In *Mehdizadeh*, a prior owner of property A built a fence between property A and property B in 1967. (*Mehdizadeh, supra,* 46 Cal.App.4th at p. 1301.) The owner of property B, who purchased the property after the fence was built, paid half of the cost, even though the parties did not know whether the fence was located on the property line. (*Ibid.*) Property A was sold in 1985 to the current owners, who "knew from plot maps" that the fence was not on the property line. (*Ibid.*) After property B was sold to the current owners in 1990, the owner of property A obtained a survey that showed the fence was 10 feet within the property line of property A. He constructed a new fence on the surveyed boundary. (*Ibid.*) The 10-foot area between the properties was

used by the owner of property B for vegetation, a sprinkler/irrigation system, and the owner's dog. (*Id.* at pp. 1301–1302.) The owner of property B filed an action to establish a prescriptive easement over the 10-foot strip. (*Id.* at p. 1302.)

The Court of Appeal held that the owner of property B could not establish title by adverse possession to the disputed parcel because he had not paid the taxes for the parcel. (*Mehdizadeh*, *supra*, 46 Cal.App.4th at p. 1305.) He could not acquire an easement by prescription if the easement were to be exclusive and would grant rights tantamount to a fee title. (*Ibid* [the easement granted by the trial court "would divest [property A owner] of nearly all rights that owners customarily have in residential property. A fence will bar [their] access to the property, and they cannot build on, cultivate, or otherwise use it."].) The easement included a fence that barred the owner of property A from physical access and excluded his use of the property, except minimally for light and air. (*Id.* at p. 1308.) Owner of property B could not acquire a prescriptive easement which is substantially equivalent to a fee title, by satisfying the lesser requirements for prescription. "To affirm the creation of this novel 'fencing easement' would dispossess an unconsenting landowner of property while circumventing readily available, accurate legal descriptions." (*Ibid.*)

Prior decisions recognize two exceptions where exclusive prescriptive easements have been allowed. The first is an exception in cases involving utility services or important essential public health and safety purposes. (See *Otay*, *supra*, 1 Cal.App.4th at p. 1046.) However, at least one court has declined to follow *Otay*, holding that the exclusive easement

34

found by the court "was the practical equivalent of an estate and should only have been permitted upon satisfaction of the elements of adverse possession." (*Hansen*, *supra*, 22 Cal.App.5th at p. 1035.)

The second involves the de minimis rule. In some cases, courts have denied a mandatory injunction to compel the removal of an encroachment by an adjoining landowner if the encroachment comes within the de minimis rule. For instance, where the encroachment of the wall of a building on the adjoining property was from one-half to five-eighths of an inch, the court in *McKean v. Alliance Land Co.* (1927) 200 Cal. 396 (*McKean*), sustained a judgment denying a mandatory injunction and instead awarded damages of $10 where there was no direct evidence that the less-than-an-inch encroachment caused any actual damage to the plaintiff. (*Id*. at p. 399.) The court stated that where the injury was so slight as to bring it within the maxim "de minimis," a mandatory injunction should not be issued. (*Ibid*.)

We find the rationales for precluding exclusive prescriptive easements—based on the distinction between estates and easements— equally applicable to exclusive implied easements. Unless the language of the creating instrument expressly provides the intention that the easement be "exclusive" to the dominant owner (see *Gray*, *supra*, 167 Cal.App.4th at p. 1021 ["[t]he express easement in question clearly provides that the easement is for the exclusive use of the owners of the dominant tenement"]), we are hard-pressed to infer the granting of an exclusive implied easement which precludes a property owner from any practical use and is nearly the equivalent of a fee interest. Based on the foregoing, we hold, in the first instance,

that an exclusive implied easement which, for all practical purposes, amounts to fee title cannot be justified or granted unless: 1) the encroachment is "de minimis" (see *McKean*, *supra*, 200 Cal. at p. 399; see *Rothaermel v. Amerige* (1921) 55 Cal.App. 273, 275–276); or 2) the easement is necessary to protect the health or safety of the public or for essential utility purposes. (*Mehdizadeh*, *supra*, 46 Cal.App.4th at p. 1306).

Here, there was no express grant of an exclusive easement. And the encroachment, totaling 1,296 square feet of appellants' 9,815-square-foot property, cannot reasonably be qualified as de minimis as it amounts to approximately 13.2 percent of appellants' property. Additionally, nothing in the record suggests the encroachment is necessary for essential utility purposes or to protect general public health or safety.

Moving on to whether the implied easement was in fact exclusive, appellants argue the trial court's decision awards respondents "exclusive use and possession of 13% of [appellants'] property [which] is not . . . legally permissible" and amounts to fee title. Whether an exclusive easement constitutes fee title or amounts to ownership in fee, rather than an easement, depends on the circumstances of the case, including the terms of any applicable conveyance. (*Blackmore*, *supra*, 150 Cal.App.4th at p. 1593.) In determining whether a conveyance creates easement or estate, courts look to the extent to which the conveyance limits the uses available to the grantor; an estate entitles the owner to the exclusive occupation of a portion of the earth's surface; that is, the property owner "would not be able to use the [d]isputed [l]and *for any 'practical purpose.'*" (*Hansen*, *supra*, 22 Cal.App.5th at p. 1034, italics added; see also *Silacci*, *supra*, 45 Cal.App.4th at p. 564 ["as a practical matter," easement

36

completely prohibited true owner from using his land].)  We review the relevant facts and evidence.

First, we note that while the trial court's statement of decision provides the implied easement "is not necessarily 'exclusive,' as various subsurface uses (e.g., running underground pipes or cables) are available to 651 property," that is not what was stated and agreed-upon by the court and respondents' counsel during the second day of trial ("It seems to me that everybody is in agreement that if . . . there were an easement in favor of the 643 property, that is essentially for exclusive use.")  Second, the three cases cited by the court in the statement of decision are inapposite.  Neither *Horowitz*, *supra*, 79 Cal.App.3d 120, nor *Rosebrook v. Utz* (1941) 45 Cal.App.2d 726, involve implied easements that were exclusive to the owner of the dominant tenement.  And the facts in *People v. Bowers* (1964) 226 Cal.App.2d 463, an eminent domain action to condemn property for state park purposes, are distinguishable from the case before us.

Third, and most significant, there is no evidence in the record that appellants could utilize the subsurface of the 1,296 square feet for any "practical purpose."  There is no evidence suggesting that appellants could run underground pipes or cables for any meaningful purpose or any conceivable use.  The evidence at trial was that appellants' property already has all the necessary utilities and water pipes, and appellants could not foresee any practical subsurface use.  We agree with appellants that the theoretical possibility of running a pipe under the easement does not render the easement non-exclusive.

Respondents' own expert Poyourow testified that the subject encroachment area is "effectively exclusive" and that the potential for any remaining use by appellants is remote. Poyourow also testified that the prospect of appellants installing new pipes underneath the encroachment area "would be remote, but it is possible to do so."

Similar to the fence in *Mehdizadeh*, *supra*, 46 Cal.App.4th at p. 1308, which barred the owner of property A from physical access and excluded his use of the property, except minimally for light and air, the block wall between the 651 and 643 properties completely precludes appellants from accessing 1,296 square feet of their land. The easement granted by the trial court essentially divests appellants of nearly all rights that owners customarily have in residential property, including access and practical usage. (See *id*. at p. 1305 [property owner cannot access, "build on, cultivate, or otherwise use" their land].) Though respondents label the 1,296-square-foot encroachment as a nonexclusive implied easement, the remedy they seek ousts appellants for all practical purposes.

Respondents' reliance on *Dixon v. Eastown Realty Co.* (1951) 105 Cal.App.2d 260 is misplaced, as it involves a "slight encroachment of defendant's garage building on plaintiffs' property." (*Id*. at p. 261.) The garage wall encroached upon plaintiff's property "a distance of 0.35 of a foot at its northwest corner and 0.15 of a foot at the northeast corner." (*Id*. at p. 262.) Thus, it comes within the de minimis rule. Respondents' reliance on *Navarro* is also misplaced, as the court found the defendant's garage that extended "approximately five feet north into" another's property was not reasonably necessary based on "testimony that it could be moved from its location straddling the

38

boundary line to a location entirely on defendant's property."
(*Navarro*, *supra*, 66 Cal.App.2d at pp. 828, 830.)  Nothing in that case suggests an implied easement can be exclusive.

During oral argument, respondents emphasized that the focus of our analysis should be on what the parties *intended*, as the purpose of implied easements is to give effect to the actual intent of the parties involved with the creation/conveyance of the easement.  (*Thorstrom*, *supra*, 196 Cal.App.4th at p. 1420.)  We find, however, that this undercuts, rather than helps, their case because the evidence relied upon by respondents demonstrates the original grantor Edwin Cutler's intent was not to create or convey an easement, but to effectuate a variance/lot line adjustment between the 643 and 651 properties.  We cannot say an application for variance resulting in a change to fee title/*ownership* of a portion of property, demonstrates an intent to create an easement for *use* of a portion of property.  To do so would be inappropriate given substantial case precedent differentiating between ownership interest in land and an easement interest in the limited use of another's land (see *Scruby*, *supra*, 37 Cal.App.4th at p. 702; see *Hansen*, *supra*, 22 Cal.App.5th at p. 1032) and the general constitutional prohibition against the taking of private property (see U.S. Const., 5th Amend.; Cal. Const., art. I, § 19, subd. (a)).

Thus, we reverse that portion of the judgment awarding an exclusive implied easement to respondents.  Because we reverse the trial court's imposition of an exclusive implied easement, we find moot appellants' second contention that the implied easement is not supported by substantial evidence.

39

C.    *We Affirm the Trial Court's Creation of an Equitable Easement.*

1.    Standard of Review

We review a court's decision whether to recognize an equitable easement under the abuse of discretion standard. (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1005–1006 (*Nellie Gail*).) We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion. (*Id.* at p. 1006.) Under that standard, we resolve all evidentiary conflicts in favor of the judgment and will not disturb the court's decision so long as it is "fashioned on the evidence and equities presented, and [is] narrowly tailored to promote justice." (*Hirshfield, supra,* 91 Cal.App.4th at pp. 771–772.)

2.    Applicable Law

Where there has been an encroachment on land without any legal right to do so, the court may exercise its powers in equity to affirmatively fashion an interest in the owner's land which will protect the encroacher's use, namely, a judicially created easement sometimes referred to as an "equitable easement." (*Hirshfield, supra,* 91 Cal.App.4th at pp. 764–765; *Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1008 (*Tashakori*).) In making its determination, the court engages in equitable balancing to determine, on the one hand, whether to prevent such encroachment or, on the other hand, permit such encroachment and award damages to the property owner. (*Hirshfield,* at p. 759.)

40

California courts have "discretionary authority to deny a landowner's request to eject a trespasser and instead force the landowner to accept damages as compensation for the judicial creation of an [equitable] easement over the trespassed-upon property in the trespasser's favor, provided that the trespasser shows that (1) her trespass was ' "innocent" ' rather than ' "willful or negligent," ' (2) the public or the property owner [seeking the injunction] will not be ' " 'irreparabl[y] injur[ed]' " ' by the easement, and (3) the hardship to the trespasser from having to cease the trespass is ' " 'greatly disproportionate to the hardship caused [the owner] by the continuance of the encroachment.' " ' " (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 19 (*Shoen*); accord *Tashakori*, *supra*, 196 Cal.App.4th at pp. 1008–1009 [factors apply to both physical encroachments and disputed rights of access over neighbors' properties].)

Unless all three elements are established, a court lacks discretion to grant an equitable easement. (*Shoen*, *supra*, 237 Cal.App.4th at p. 19; see *Ranch at the Falls LLC v. O'Neal* (2019) 38 Cal.App.5th 155, 184–185.) This is true even if the court believes the imposition of an equitable easement is fair and equitable under all circumstances. (*Shoen*, at pp. 19–21.) Thus, the court's focus must be on the three elements, rather than "a more open-ended and free-floating inquiry into which party will make better use of the encroached-upon land, which values it more, and which will derive a greater benefit from its use." (*Id*. at p. 21.)

" 'Overarching the analysis' " is the importance of the legal owner's property rights and " 'the principle that since the [encroacher] is the trespasser, he or she is the wrongdoer; therefore, "doubtful cases should be decided in favor of the

41

[property owner with legal title].” ’ ” (*Nellie Gail*, *supra*, 4 Cal.App.5th at p. 1004; accord *Shoen*, *supra*, 237 Cal.App.4th at pp. 19, 21.)  Equitable easements give the trespasser “what is, in effect, the right of eminent domain by permitting him to occupy property owned by another.” (*Christensen v. Tucker* (1952) 114 Cal.App.2d 554, 560 (*Christensen*).)  Such a right is in tension with the general constitutional prohibition against the taking of private property (U.S. Const., 5th Amend. [private property shall not be taken for public use, without just compensation]; Cal. Const., art. I, § 19, subd. (a) [same]).  (*Shoen*, at p. 21.)  “This is why courts approach the issuance of equitable easements with ‘an abundance of caution’ [citation], and resolve all doubts against their issuance.” (*Ibid*.)  This also “explains why additional weight is given to the owner’s loss of the exclusive use of the property arising from her ownership, independent of any hardship caused by the owner’s loss of specific uses in a given case.  And it elucidates why there must be a showing that the hardship on the trespasser be greatly disproportionate to these hardships on the owner.  To allow a court to reassign property rights on a lesser showing is to dilute the sanctity of property rights enshrined in our Constitutions.” (*Ibid*.)

   3.   Analysis

   Appellants challenge the court’s ruling with respect to each element.  We address each in turn.

         a.   *Element #1*:  Trespass must be innocent and not willful or negligent.

   The encroaching party’s innocent intent is “paramount”—if the encroaching party is “willful, deliberate, or even negligent in

42

his or her trespass, the court will enjoin the encroachment." (*Hirshfield, supra*, 91 Cal.App.4th at p. 769.)

Substantial evidence supports the trial court's finding that respondents were innocent and did not have knowledge of their encroachment on appellants' 651 property. The Seller Property Questionnaire executed by respondents provides there are no "[s]urveys, easements, encroachments or boundary disputes" regarding respondents' 643 property. In addition, their agent Tsai testified that neither he nor his clients knew of the encroachment at the time of purchase.

Appellants argue documentary evidence established that respondents were negligent. They refer to the Buyer's Inspection Advisory signed by respondents before close of escrow, advising respondents to conduct a thorough inspection of the entire property to make sure the lot size and boundaries were accurate. The document also warns that the square footage, lot size, boundaries, fences or walls "do not necessarily identify true property boundaries." Appellants contend respondents "did not do what they were advised to do, that is investigate the true square footage and boundaries" and, as such, were negligent.

Respondents, on the other hand, argue appellants' transactional documents "contained the same advisory, yet they too did not conduct an investigation." Respondents contend appellants "cannot credibly argue that [respondents] should have verified lot size and boundaries [to discover] the existence of the encroachments when [appellants] themselves did no such investigation and did not discover the encroachments until a year after purchase."

We agree. Case law provides that the court may refuse to enjoin a negligent encroachment "if there is corresponding contributory negligence by the landowner." (*Hirshfield*, *supra*, 91 Cal.App.4th at p. 769.)

Thus, the first element is satisfied.

> b. *Element #2*: Appellant must not be irreparably injured by the easement.

If the party seeking an injunction of encroachments "will suffer irreparable injury by the encroachment, the injunction should be granted regardless of the injury to [the encroaching party], except, perhaps, where the rights of the public will be adversely affected." (*Christensen*, *supra*, 114 Cal.App.2d at p. 563.) The phrase "irreparable injury" is interchangeable with "irremedial injury," "unusual hardship," and "substantial hardship." (See *Hirshfield*, *supra*, 91 Cal.App.4th at p. 760.)

The trial court found appellants "would not suffer any irreparable harm from such continued encroachment" because "the evidence . . . does not indicate [appellants] would suffer any concrete, serious harm." Substantial evidence supports the trial court's finding. Appellants' use of the lot since their time of purchase has remained exactly the same before and after the discovery of the encroachment. While appellants testified that enjoining respondents' encroachment would allow them to increase their privacy, plant an orchard in the front, and place a pool in the back, the record before us does not contain evidence of any actual plans to do so, either before or after the reveal.

Appellants argue the continued encroachment causes them irreparable injury because they "will have to continue paying property taxes on property they cannot even use." Appellants "will also be subject to potential civil liability to the extent

44

anyone gets hurt on the 1,296 square foot area because, even though they cannot use that area, [they] are still the legal owners of that area." These are valid arguments indeed. However, they fail as the record before us contains no evidence, let alone substantial evidence, about the amount of property taxes appellants pay for their 9,815-square-foot property and what amount of their property tax payment is attributed to the 1,296-square-foot encroachment. Similarly, there is no substantial evidence indicating the likelihood or existence of premises liability in connection with the encroachment area other than appellants' speculation about children possibly "trip[ping] over a loose brick."

      Thus, the second element is also satisfied.

          c.     *Element #3*: The hardship to the trespasser from ceasing the trespass is greatly disproportionate to the hardship caused to the landowner by the continuing encroachment.

      Through the doctrine of "balancing conveniences" or "relative hardship," courts may create equitable easements by refusing to enjoin what otherwise would be deemed an encroachment or nuisance. (*Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 265 (*Linthicum*); see also *Christensen*, *supra*, 114 Cal.App.2d at pp. 562–563.) "These labels suggest that an equitable easement may issue if the conveniences or hardships merely favor the trespasser, when the doctrine actually requires that they tip disproportionately in favor of the trespasser." (*Shoen*, *supra*, 237 Cal.App.4th at p. 20.)

      In *Shoen*, for instance, the court found it was error to impose an equitable easement where the hardship to a neighbor in having to spend $300 to remove patio furniture from the

landowner's property was not "greatly disproportionate" to the hardship on the landowner in losing the use of the property. (*Shoen*, *supra*, 237 Cal.App.4th at pp. 18, 21–22 [finding deprivation of substantial benefit falls short of imposing substantial hardship].) The typical hardship required to permit an equitable easement is where the trespasser "would be forced to move buildings or be airlifted to their landlocked property." (*Id*. at p. 22.)

Appellants contend respondents cannot demonstrate the disproportionality of their hardship because "there is no testimony from them about their trespass or hardship." Appellants believe respondents' "failure to testify is dispositive and therefore the court abused its discretion in finding an equitable easement."

Not so. The record contains substantial evidence supporting the inference that the hardship experienced by appellants is greatly outweighed by the actual harm respondents would suffer if the encroachments were enjoined. McCormick testified the driveway for respondents' 643 property would be reduced to 7.2 feet at its narrowest point (for an approximate 32-foot stretch between the actual property line and the side of the house on respondents' property. This would result in a driveway width of less than 10 feet, the minimum required by the City. In addition, reducing the driveway width to 7.2 feet would severely limit most vehicles from using the driveway and would preclude individuals from opening car doors to exit or enter a vehicle. There was also expert testimony that the existence of the encroachment resulted in a diminution of value of $67,000 (or $4,000 more using 1,296 square footage) to appellants'

651 property, whereas the diminution of value to respondents' 643 property without the easement is $133,000.

Thus, the third element is also satisfied, and the trial court was within its power to grant an equitable easement.

> d.      The scope and duration of the equitable easement must be narrowly tailored.

Finally, appellants challenge the terms and scope of the trial court's equitable easement, arguing that it is not narrowly tailored.

Courts limit the rights of the equitable easement holder both in duration and scope (*Hirshfield*, *supra*, 91 Cal.App.4th at pp. 753, 771 [the equitable easement interest would terminate when the defendants either "sell or fail to reside in their house"]); this aligns with "why courts approach the issuance of equitable easements with '[]an abundance of caution' [citation], and resolve all doubts against their issuance." (*Shoen*, *supra*, 237 Cal.App.4th at p. 21.) The scope of an equitable easement *should not be greater than is reasonably necessary to protect the use interest* of the purported dominant tenement owner. (*Christensen*, *supra*, 114 Cal.App.2d at p. 563; *Linthicum*, *supra*, 175 Cal.App.4th at pp. 267–269 [abundance of caution is warranted when imposing easement on unwilling landowner].) So long as the equitable easement is "fashioned on the evidence and equities presented, and narrowly tailored to promote justice," the decision granting the equitable easement will not be disturbed. (*Hirshfield*, at p. 772.)

Appellants contend most of the 1,296-square-foot easement has nothing to do with respondents' use and interest in "reasonably necessary" ingress/egress and is far too encompassing in scope. They argue the equitable easement is not

47

narrowly tailored and is greater than reasonably necessary to protect respondents' interest in reasonable ingress/egress via driveway use; they urged us to modify the equitable easement.

At oral argument, respondents argued this court should not exercise equity and should not modify the easement. Respondents contend the evidence with respect to their equitable easement cause of action considered the entire 1,296 square-foot encroachment as a whole, and there was no evidence in the record to suggest a number less than 1,296 square feet. They cited to testimony from appellant Ms. Romero where she told the underlying court she did not want to give up any of the disputed 1,296 square feet belonging to her. Respondents believe appellants have thus waived the issue, i.e., whether the scope of the easement could be more narrowly tailored to meet the "no greater than reasonably necessary use" standard.

We agree with respondents.

Although the trial court's detailed 13-page statement of decision does not expressly specify the equitable easement is "narrowly tailored" and not greater than "reasonably necessary" to protect respondents' use interest, it does however specify that the "equitable easement should run with the land, but *should terminate if the 643 Property were to cease its continued use of that land for a driveway, planter and wall/fence.*"  (Italics added.) Thus, the trial court's judicially crafted equitable easement is limited in scope and duration such that the current use of the easement area as a "driveway, planter and wall/fence" must continue, as is, or else the equitable easement is extinguished.

In addition, appellants made this same argument via their September 8, 2020 objections to the trial court's proposed statement of decision, claiming the equitable easement is "not

narrowly drawn to promote justice." Thereafter, the trial court filed its final statement of decision on September 28, 2020; it "decline[d] to address every legal and factual issue raised by [appellants] or respond point by point to each issue and contention (however immaterial)," citing to *Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 112 [" 'A statement of decision need not address all the legal and factual issues raised by the parties' "]. There is nothing in the record that leads us to conclude the trial court did not consider appellants' objections when it crafted an easement that would extinguish when the area was no longer used for its present purposes.

Finally, and most importantly, the trial court provided appellants multiple opportunities to provide evidence and argument as to how the easement could be more narrowly tailored. The court asked appellants during trial: "Let me ask, because I don't think the number 1,200 is particularly magical. . . . So what would be less than this?" "[W]hat would be equitable under the circumstances. It could be greater or smaller than what is asked for by [respondents]." The court later asked appellants again: "If in equity I were to find that [respondents] were entitled to some measure of land so they could have a functional driveway, . . . do you have an alternative proposal that would be more narrowly tailored to their need?" The court repeated its question to appellants later: "Well, again, I asked you from zero to 1,296 [square feet,] what do you propose, and you have said zero or 1,296." "So if there's some other formulation of square footage that the Court could reasonably tailor an equitable easement, then I certainly will hear you out as to that."

Despite the trial court's repeated invitations, appellants instead doubled down and in the final moments of trial, appellant Tatana Romero stated: "I just wanted to clarify . . . I heard something about giving up to two feet. And I want to make sure I'm not authorizing anyone to give up anything, and we're not going to give up any part of the disputed land. That's it." Appellants opted for an all-or-nothing approach; in this case, this strategy hurt them because they failed to include as part of the record any evidence about how the easement may have been more narrowly tailored and not greater than reasonably necessary for respondents' use.

We are hard pressed to find the trial court abused its discretion when it created an equitable easement that merely maintains the improvements on the disputed land that have been in use and existence for decades.

## DISPOSITION

The judgment is reversed as to the cause of action for implied easement. The judgment is affirmed as to the cause of action for equitable easement. Respondents shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

HARUTUNIAN, J.*

---

*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

51